IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


Plaintiff:

APR 4 2023 PM 2:00
FILED-USDC-CT-HARTFORD

1    Pamela Chapman                          :
     121 King Charles Drive
     Portsmouth, Rhode Island 02871
                                             :
                                             :
                                                  Case  No._____

          vs.                                :

2    Jonathon Karp                           :    COMPLAINT
     300 East 56th St, Apt 3D
     New York, New York 10022                :

3    Nancy Graham                            :
     40 White Street
     New York, New York 10013-3581

4    Hope van Beuren                         :
     15 Indian Avenue
     Middletown, RI 02842

5    Esmond Harmsworth IV, JD                :
     8 Arlington Street
     Boston, MA 02116

6    Roger Kass, esq.                              :
     1180 Park Avenue
     New York, New York 10128

7    Kamala Harris                           :
     Office of the Vice President
     18000 G Street, NW
     Washington, D.C. 20502

8    Earl A. "Rusty" Powell III, JD               :
     145 Hammersmith Road
     Moreland Farms #16
     Newport, Rhode Island 0287

9    Senator Mitch McConnell                 :
     317 Russell Senate Office Building
     Washington, D.C. 20510

10      Senator Chuck Schumer
        322 Hart Senate Office Building
        Washington, D.C. 20510

11      Congresswoman Nancy Pelosi
        1236 Longworth H.O.B.
        Washington, D.C. 20515

12      Secretary of Commerce Gina Raimondo
        1401 Constitution Ave NW
        Washington, D.C. 20515

13      Congressman David Cicilline
        (resigned as of June 1, 2023)
        Until May 31, 2023,
        2233 Rayburn H.O.B.
        Washington, D.C. 20515

14      President Joseph Biden
        1600 Pennsylvania Avenue
        White House, Washington, D.C. 20500

15      Jill Biden
        Office of the Frist Lady
        1600 Pennsylvania Avenue 20500

16      Patricia Hamilton Fernandez
        417 West Calhoun Street
        Sumter, NC 29150-4534

17      Michael Fernandez
        417 West Calhoun Street,
        Sumter, NC 29150-4534

18      Andrea van Beuren
        1180 Park Avenue
        New York, New York 10128

19      Barbara van Beuren Glascock
        120 West 72nd Street
        New York, New York 10128

20      Archibald van Beuren
        636 Black Rock Road
        Bryn Mawr, Pennsylvania 19010

21      Ann F. Hamilton
        1001 Rock Creek Road,
        Bryn Mawr, Pennsylvania 19010

22      Dorrance Hamilton Benson
        132 Webster Street,
        Newport, RI 02840

23      Elizabeth Lynn
        15 Seafarer Court
        Jamestown, RI 02835

24      Rebecca Bertrand
        29 Carey Street
        Newport, RI 02840

25      Kimberly Witherspoon
        44 June Road
        North Salem, NY 10560

26      Mark Halperin, NBC Universal
        100 Universal City Plaza
        University City, CA 91608

27      Nicholas S. Schorsch
        51 Cliff Avenue
        Newport, Rhode Island 02840

28      Shelley Davis Schorsch
        51 Cliff Avenue
        Newport, Rhode Island 02840

29      Nicholas S. Schorsch II
        212 East 57th Street, #12a
        New York, New York 10022

30      William M. Kahane, JD
        310 Ocean Drive
        Newport, RI 02840

31      Elizabeth Wright Kahane
        310 Ocean Drive
        Newport, RI 02840

32      Harold "Harry" Kahane
        310 Ocean Drive
        Newport, Rhode Island 02840

33      David W. O'Leary
        25 Grey Widgeon Lane
        St. John, Kiawah Island, SC 29455

34      Linda A. O'Leary
        25 Grey Widgeon Lane
        St. John, Kiawah Island, SC 29455

35      Carl Helmetag
        339 Sea View Avenue
        Riverside, Rhode Island 02915-4817

36      Paul McGreevy
        52 Hunter Avenue
        Newport, RI 02840

37      Beatrice of York, Mrs. Edoardo Mapelli Mozzi
        St. James Palace
        Marlbourgh Road
        St. James,
        London England SW1A 1BS

38      Catherine, Princess of Wales, Catherine Middleton
        Clarence House
        Westminster
        London, England SW1A 1BA

39      Christa Durand
        5 Whitfield Place
        Newport, Rhode Island 02840

40      Leora Maltz-Leca, PhD
        85 Tipping Rock Drive
        East Greenwich, Rhode Island 02818

41      Benedict Leca, PhD
        85 Tipping Rock Drive
        East Greenwich, Rhode Island 02818

42      Jacalyn Egan
        128 Beacon Street, No. A
        Boston, MA 02108

43      William Egan
        128 Beacon Street, No. A
        Boston, MA 02108

44      Peter "Jed" Wilcox
        5 Key Court
        Newport, Rhode Island 02840

45      Elena Wilcox
        5 Key Court
        Newport, Rhode Island 02840

46      Robert Manice
        229 Dedham Street
        Dover, MA 02030

47      Elizabeth "Lisa" Goddard
        12 Leroy Street
        Newport, Rhode Island 02840

48      Thomas P.I. Goddard
        12 Leroy Street
        Newport, Rhode Island 02840

49      Katherine Fields
        428 Thames Street
        Newport, Rhode Island 02840

50      Taylor "Toby" Fields
        428 Thames Street
        Newport, Rhode Island 02840

51      Christine McIntyre
        57 Newport Street
        Jamestown, RI 02835

52      Jerry McIntyre, Esq.
        57 Newport Street
        Jamestown, RI 02835

53      Caroline DuPont
        5 Berkeley Street
        Newport, RI 02840

54      Sandra Oursuloff Massey
        165 Mount Vernon Street
        Boston, MA 02108

55      Michael Holt Massey III
        165 Mount Vernon Street
        Boston, MA 02108

56      James H. Ross, esq.
        1130 Park Avenue
        New York, New York 10128

57      Alice Ross
        1130 Park Avenue
        New York, New York 10128

58      Noreen E. M. Drexel O'Farrell
        90 Blueberry Lane
        Jamestown, Rhode Island 02835

59    Susan Conklin Nance
      194 Meadow Lane
      Middletown, RI 02842

60    Thomas C. Hockaday
      144 Wapping Road
      Portsmouth, RI 02840

70    William C. Martin
      144 Wapping Road
      Portsmouth, RI 02840

71    Catherine M. Wicks
      117 Lawrence Drive
      Portsmouth, RI 02871

72    Andrew K. Parsons, M.D.
      125 Hilltop Drive
      Portsmouth, Rhode Island 02871

73    Laura E. Dadagian O'Rourke, esq.
      25 Bay Road
      Marion, MA 02738

74    James O'Rourke, M.D.
      25 Bay Road
      Marion, MA 02738

75    James F. English, M.D.
      President, Anesthesia Associates of MA
      56 Cabot Street
      Milton, MA 02186-4219

76    Ross J. Musumeci, M.D.
      300 Second Avenue Unit 4142
      Needham Heights, MA 02494

77    Patricia Gibbons
      42 Cromwell Drive
      Portsmouth, RI 028712

78    Steven Punzak, M.D.
      156 River Road, Suite 2301
      Willington, CT 06279

79    Caroline Crosson Gilpin
      9 Holland Place
      Hartsdale, NY 10530

80      Katherine Gilpin
        9 Holland Place
        Hartsdale, NY 10530

81      Tara Plochocki, esq.
        1531 Park Road NW
        Washington, D.C. 20010-2216

82      Diane Crosson McEnroe, esq.
        21 Cresthill Place
        Stamford, CT 02902

83      Nola Ganem
        21 Arnold Street
        Newport, Rhode Island 02840

84      Maura Lindsey
        Tresor Estates
        22 Franklin Street
        Newport, Rhode Island 02840

85      Noam B. Zilberstein
        206 Taughannock Blvd #20
        Ithaca, NY 14850

86      Jana Hicks Jagoe
        20 Winans Avenue
        Newport RI 02840

87      Donald A. Jagoe
        20 Winans Avenue
        Newport RI 02840

88      Lauren DiFedes
        728 Harborside Way
        Kemah, Texas 77565-3069

89      Tara Gragg
        Boston Ballet School
        19 Clarendon Street
        Boston, MA 02116

90      Bethany DiNapoli
        287 Gibbs Avenue
        Newport, Rhode Island 02840

91      Monique Burgess
        3 Osborne Court
        Newport, RI 02840

92    Thomas J. Burgess
      3 Osborne Court
      Newport, RI 02840

93    Cole Burgess
      3 Osborne Court
      Newport, RI 02840

94    Cameron Burgess
      3 Osborne Court
      Newport, RI 02840

95    Dominque Alfandre
      20 Warner Street
      Newport, Rhode Island 02840

96    Nora Diedrich
      Tucson Museum of Art
      140 North Main Avenue
      Tucson, AR 85701

97    Francine Weiss, PhD
      82 van Zandt Avenue
      Newport, RI 02840

98    Elise F. Fagnoli
      236 Tyott Road
      Pomfret, CT 06259

99    Caroline "Dolly" Briggs
      132 Webster Street
      Newport, Rhode Island 02840

100   Skelley Ann "Daisy" Briggs
      100 Webster Street
      Newport, Rhode Island 02840

101   Allegra Chapman
      1009 Park Avenue, #7A
      New York, New York 10566

102   Antonia Chapman
      1009 Park Avenue, #7A
      New York, New York 10566

103   Elizabeth Ross
      1130 Park Avenue, #82
      New York, New York 10128

104     Virginia "Tully" Ross
        1130 Park Avenue, #82
        New York, New York 10128

105     Harling Ross Anton
        1130 Park Avenue, #82
        New York, New York 10128

106     Kayla Abbate
        143 Second Street
        Pawtucket, Rhode Island 02861

107     Kathleen Marie Moore Abbate
        33 Russell Way
        Ogunquit, ME 03907

108     Richard Abbate
        33 Russell Way
        Ogunquit, ME 03907

109     Tracey Moore
        269 Gibbs Avenue
        Newport, RI 02842

110     Merrill Maloney Allen
        46 Steamboat Street
        Jamestown, RI 02835

111     Leslie R. Grosvenor
        208 Ocean Avenue
        Newport, RI 02840

112     Shauna S. Maguire
        7 Dyers Gate
        Newport, Rhode Island 02840

113     Nancy Whipple Grinnell
        18 Prescott Hall Road
        Rhode Island 02840

114     Jean Gorham
        The Ledges, 61 Ledge Road #C
        Newport, Rhode Island 02840

115     Alberto Villodo, PhD
        The Four Winds Society
        P.O. Box 330397
        Coconut Grove
        Miami, Florida 33233

116     Marcella Lobo Villodo
        The Four Winds Society
        P.O. Box 330397
        Coconut Grove
        Miami, Florida 33233

117     Grenville Vernon Craig
        P.O. Box 656
        Newport, Rhode Island 02840

118     Sandra Cuccia Craig, JD
        P.O. Box 656
        Newport, Rhode Island 02840

119     Caroline Craig
        P.O. Box 656
        Newport, Rhode Island 02840

120     Kristin MacMannis
        130 Carriage Drive
        Portsmouth, RI 02840

121     David Johndrow
        6715 Firestone Place
        Lakewood Ranch, FL 34202

122     Kaitlyn Johndrow
        6715 Firestone Place
        Lakewood Ranch, FL 34202

123     Magdalena Garczynski Johndrow
        22 Random Road
        Fairfield, Connecticut 06825

124     Dina Karousos
        29 Fieldstone Drive
        Portsmouth, RI 02871

125     Susan Andrade Bistline
        118 Holland Avenue
        Middletown, RI 02842

126     Laurianne Florio
        173 Lincoln Street
        New Britain, CT 06053

127     Diana Florio Beardsley
        22 Burgundy Drive
        Berlin CT 06037

128     Lorraine Florio-Olsen
        9 Avenue A
        Old Lyme CT 06371

129     Timothy Quinn Delaney
        P.O. Box 30818
        Charleston, SC 29417

130     Erin Delaney
        40 East Oak Street #1
        Chicago, IL 60611

131     Robert Ford Bauer II
        Kadey-Krogen
        New England Boatworks
        1 Lagoon Road
        Portsmouth RI 02871

132     Chandler Moore
        5055 S Dale Mabry Highway
        Tampa, FL 33611

133     Quentin Warren
        125 Rhode Island Avenue
        Newport, Rhode Island 10840

134     Jessica Hagen
        12 George Street
        Newport, RI 02840

135     Timothy Hollister, esq.
        20 Church Street
        Hartford, CT 06103

136     Christine K. Bush, esq.
        100 Westminster Street
        Providence, RI 02852

137     Wendy Schmidt
        555 Bryant Street
        Palo Alto, CA 94301

138     Gabrielle Bernstein
        56 Whitcomb Road,
        Cornwall Bridge, CT 06754

Jurisdictions and Venue

139

The federal court has exclusive jurisdiction over civil rights cases and federal criminal cases arising from copyright law, and breach of contract over $75,000. For this case, Jurisdictions include constitutionally and Congressionally guaranteed civil rights under the following:

> First Amendment,
> Fourth Amendment,
> Ninth Amendment,
> Fourteenth Amendment.
> Violence Against Women Act, (Domestic Abuse Act)
> Health Insurance Portability and Accountability Act, and
> U.S. ratified Article 17, International Covenant on Civil and Political Rights (ICCRR), a human rights treaty that guarantees privacy rights. Article 17 "protects everyone form arbitrary or unlawful interferences with their privacy, family home, or correspondence."

140

Jurisdictions include US federal United States criminal codes, but are not limited to the following:

> First Degree Grand Larceny Theft,
>
> 18 U.S.C. §3282,
>
> 18 U.S.C. §666 (a) (1) (1) Embezzlement,
>
> 18 U.S.C. §242 Deprivation of Employment, The Right to Earn a Living,
>
> 18 U.S.C. §242,
>
> 42 U.S.C. §1983,
>
> 17 U.S.C. §506(a)(1)(A) Willful Infringement for commercial advantage or private financial   gain,
>
> 17 U.S.C. §506(a)(1)(B) Willful infringement by distribution of  more than 1 copy,
>
> 17 U.S.C. §506(a)(1)(C) Pre-release Piracy,
>
> 17 U.S.C. §506,
>
> 18 U.S.C. §1341 Frauds and Swindles,
>
> 18 U.S.C. §2319 Criminal Infringement of a Copyright Risk, Permanent Loss of the Item,
>
> 18 U.S.C. §1951, Interference with Commerce by Threats or Violence,
>
> 15 U.S.C. §2 Commerce and Trade Monopoly to Restrain and Prohibit a Person from Conducting Interstate Commerce Contracts in an Interstate Industry,
>
> 18 U.S.C. §1801 – Voyeurism,

Crimes Motivated by Gender 42 U.S.C. §13981,
Title 52-Voting and Elections Subtitle I-Voting Rights, 10101 (b) & (c),

18 U.S.C. §113 & §114, Assaults,

18 U.S.C. Collusion §250, Penalties for Civil Rights Offenses Involving Sexual Misconduct with 18 U.S.C. §242,

18 U.S.C. §1341, Frauds and Schemes,

18 U.S.C. §2314,

18 U.S.C. §241, Conspiracy Against Rights,

18 U.S.C. Conspiracy Against Rights, §245,

18 U.S.C. §2, Aiding and Abetting,

18 U.S.C. §3 for Accessory after the Fact, and

18 U.S.C. §241, Collusion, Conspiracy against Civil Rights.

141
Diversity of citizenship jurisdiction, as codified under the Judiciary Act of 1789, 28 U.S.C. §1332 allows a plaintiff of one state to file a lawsuit in federal court when the defendants are located in different states, or a foreign state. For this case, Defendants reside in the same and multiple states, and two foreign countries. Defendants also includes state actors of the federal government, including one retired Director of the National Galley who was at the time of reveal —February 8, 2021—the appointed federal chair of the United States Commission of Fine Arts.

142
The Plaintiff, Pamela Chapman hereby known as the Plaintiff, seeks representation in the United States District Court for the District of Connecticut, Hartford, under Chief Justice, Michael P. Shea, of the United States District Court for the District of Connecticut, with Law Clerk, Amy Constantine. The 137 Defendants in the case, unless explicitly named, are collectively referred to as the Defendants, present a conflict of interest, individually and or collectively to the United States District Court for the District of Rhode Island. The 14th Amendment gives every citizen the right to due process of the law. The Defendants include a 7-term Congressman recently resigned, a two-term immediate past Governor, now the Secretary of Commerce, and the spouse an Assistant Attorney General for the State of Rhode Island.

143
The Plaintiff grew up in New Britain, Connecticut, graduated from college in Middletown, Connecticut, and is seeking to purchase a particular, unique property in Farmington, Connecticut, already identified, to be a legal resident of the state of Connecticut, as soon as financially possible. The Plaintiff identifies the state of Connecticut as home.

144

In this case, the 137 Defendants worked in collusion to commit the civil rights and criminal offenses, as either direct perpetrators or as accessory participants through direct and indirect actions, inactions, or silence. For this case, all collusions include conspiracy against civil rights, and with criminal actions, offenses of aiding and abetting, misprision of a felony, and accessory after the fact.

145

All Defendants, as members of various groups, presumed subgroups, and interested individuals, pledged spoken and unspoken loyalties to each other to speak in one unified voice to achieve the desired end result. Whether or not the Defendants actually understood the full scope of what was strategized through what was known as <u>Kamala's Table</u>, the <u>Redwood Library Book Committee</u>, <u>Tom Hockaday's House</u> or <u>Kamala Harris' Workgroup</u>, and all other accessory individuals, became irrelevant. All Defendants found a desire, a pleasure, and or a personal interest in participating in the civil rights and criminal offenses. It was a network of inclusion, membership, and belonging. There was a perception that each Defendant would achieve a personal desired outcome, and/or some new status and opportunity for their position in the network, or with and against the targeted mission: the Plaintiff and her book.

146

All Defendants reinforced one another's behavior, and convinced each other that there would be no legal liability for their actions, despite almost a daily reminder from the Plaintiff that she would take each one to court.

147

The Defendants were able to achieve a variety of end results, including but not limited to: disseminate the content of the Plaintiff's literary novel to as many persons as possible; inquire—through the use of slander, harassment, physical and sexual abuse and assault, violence against women, torture, black magic curses (also known as sorcery, Secret Society rites, and other cultural names)—of the veracity of every line and scene in the book to prove the book was a memoir based in real life; gather through scavenger hunt activity individually and as group activity, every possible conversation, and memory ever known to anyone about the Plaintiff—and then through various aggressive and passive aggressive acts—slander, harass, abuse, and destroy the book, and then defame the Plaintiff.

148

All Defendants worked together to either create, enhance, or malign with fraudulent schemes to prevent the book from the event of being published by a major publishing house, in one case claiming a proof that the Plaintiff plagiarized her work from another, disqualifying her from ever having the work bare the Plaintiff's name as the true author, yet transferring authorship to another for profit or gain in the publishing and film industries. There also was the fraudulent scheme with the <u>Kamala Harris</u> group, known as the <u>Workgroup</u>, whereby as a group, members reviewed and line edited the book. Then, they reformatted it with the name of another for e-book sales and profit. The <u>Redwood Library Book Committee</u> previously mirrored the same activity.

149

All Defendants colluded in a bandwagon effect of a hate crime against the Plaintiff gathering every person the plaintiff has known in her life, several of whom populated <u>Kamala's Table</u> and the <u>Workgroup</u>.

150

The Plaintiff charges all Defendants with collusion, aiding and abetting, misprision of a felon, and accessory after the fact. All Defendants are jointly and individually liable.

151

The *prima facie* –at first sight, at first view, based on first impression— evidence presented in Exhibit A is so overwhelming, it is enough to prove the case. There is no contradictory evidence anywhere, not from any Defendant nor witness, to disprove the evidence presented in Exhibit A. No defendant possesses any evidence to overcome the *prima facie* evidence to prevail. As such, the legal claim has sufficient evidence to proceed directly to judgement. If necessary, in addition to a *prima facie* defense, the Plaintiff asks the United States District Judge for a summary judgement wholly, or partially, to facilitate remedy to the case.

152

The Plaintiff, Pamela Chapman has a burden of proof to present prima facie evidence for each element of the charges against each Defendant. The burden of proof is presented in Exhibit A. Exhibit A contains over 1825 pages of physical evidentiary documentation. Exhibit A provides phenomenon, technologies, consistencies, outcomes, and witnesses.

153

Timothy Hollister, esquire said he personally documented all persons of stature in society who spoke as witnesses, including national politicians, judges, and lawyers. Associate Judge for Newport County District Court, Second Division Rhode Island, Colleen M. Hastings; and Administrative Trademark Judge, Peter W. Cataldo, Newport, RI of the Trademark, Trial and Appeal Board, US Patent and Trademark Office were present and documented. They have previous associations with the Plaintiff: in the Plaintiff's unique divorce, and as a fellow non-profit board of trustee.

154

All defendants and witnesses understood the Plaintiff would seek justice and remuneration in a United States court of law. The following was understood and agreed to by all Defendants and witnesses in this case:

155

"In real time and real space we validate everyone simultaneously … This is the acknowledgement. We validate you all are here together now."
May 21, 2021, Eric Schmidt, Former CEO of Google with Wendy Schmidt, President of the Schmidt Family Foundation, & Pamela Chapman, Author

156

"We wrote and agreed that all date-time stamps with witnesses should be legal in a court of law in any legal proceeding."                    3:44PM, July 2, 2021

157

"The defendants pay all attorney, court, and associated legal fees because of the size of the lawsuits, and the fact they were in a position and possession of resources unavailable to the plaintiff, Pamela Chapman."              July 19, 2021

158

"If they [Defendants] perjure themselves, the entire discovery process can be taken back into defendants to remind them of their own language documented and quoted. Matt Lauer tried to perjure himself. Over a long day of deposition, he finally confessed to that which was previously discussed in this same fashion. Gretchen Carlson provided testimony to this experience herself."              July 23, 2021

159

"No one gets away with anything except those whose voices are not heard or remembered."
From printed matter: Matt Lauer, August 19, 2021

160

If the charge of medical malpractice (from September 2011) and insurance fraud (from September 2011) against Defendants Christa Durand, President of Newport Hospital, Lifespan Health Care Systems, Andrew Parsons, M.D., James O'Rourke, M.D., Department Chair, Anesthesia Associates of MA, James English, M.D., President, Anesthesia Associates of MA, Ross Mususmeci, MD Senior Vice President Anesthesia Associates of MA, and Laura E. Dadagian O'Rourke, esquire is outside the scope of these proceeding, the Plaintiff requests the court to consider a pattern and culture of malfeasance with these unique Defendants and their professional networks against the Plaintiff that began in September 2011. The pattern re-emerged between 2019 – 2023 with the participation of the Plaintiff's stolen book and all other illicit actions associated with it, including slander, harassment, abuse, defamation of character, incapacitation, manslaughter, physical assault, loss of consortium, loss of opportunity, and pain and suffering. Patricia Gibbons, wife of Lawrence Gibbons, D.O., Steven Punzak, M.D., Ross Musumeci, M.D., James English, M.D., James O'Rourke, M.D., and Laura Dadagian O'Rourke, esq. were involved both in 2011 and from 2019 – 2023.

161

Christa Durand was not employed at Newport Hospital in 2011. Through the van Beuren family, who sits on the Newport Hospital Foundation board of trustees, the van Beuren Charitable Trust, and Hope van Beuren herself, Christa Durand became involved in this case.

162

It is said the van Beuren family is the largest donor to Newport Hospital. Hope van Beuren and her sister, Dorrance Hamilton were direct heirs to a Campbell Soup fortune, making them part of family listed as the fourteenth wealthiest in the United States. They grew up in Newport, Rhode Island. A new emergency department at Newport Hospital is now named for Hope and John Archibald van Beuren, which is printed in large letters across the front of the Emergency Room entrance.

163

It was said by Christa Durand in the spring of 2021 that Newport Hospital does not care about the patients on the eight floor (psychiatric department), that they are not equal patients in the eyes of the administration. She implied they are discriminated against and cast aside by the administration as not needing a suitable place in the hospital for their unique stays, which is guaranteed to all other patients.

164

The Plaintiff's novel—literary fiction—describes a nine –day forced incarceration in the psychiatric department of the local hospital of a protagonist—sent there by her physician husband as part of an offensive strike against the protagonist during a divorce—where the facilities for the psychiatric patients are less than one could imagine, and unlike those for all other patients at a boutique island resort hospital.

165

Hope van Beuren claimed that the Plaintiff's book, which they illicitly stole, and a work of fiction, brought a disgrace to Newport Hospital—and herself—by the very descriptions used by the Plaintiff. For that reason alone, the van Beuren family determined the book needed to be destroyed.

166

Several readers of the book— hospital doctors and nurses given the book illicitly through Christa Durand— were to respond to the veracity of the descriptions provided by the author. One such physician is a neighbor of the Plaintiff. His wife claimed to have read the book.

167

Hope van Beuren repeatedly said she had no interest in ever improving the physical facility of the eight floor, implying only those patients on the other floors deserved the facility upgrades that her family and its

foundation were willing to underwrite. Yet, she claimed to be upset that the Plaintiff brought a disgrace to her beautiful hospital by the very descriptions in the Plaintiff's work of fiction.

168

Christa Durand's comment about the administration not caring about those patients is a fundamental discrimination for a hospital receiving federal funds through the US Navy. Prior to contracting with Lifespan Health Systems, Newport Hospital could not meet its budget and payroll without federal funds paid through the U.S. Navy. As a navy medicine hospital, it is an implied federal facility, subject to federal code not yet specified in this filing.  It should not be misunderstood that Newport Hospital leases half of its operating rooms suites to the United States federal government for use by the United States Navy for Naval Station Military Base Newport personnel, approximately 5,800 persons, almost one-third the size of the population of Newport, RI.  It also sends military personnel, a training station for the Surface Warfare Officer School, to the psychiatric department, as ordered by commanding officers.

169

It should also be noted that the Plaintiff's ex-husband, Andrew Parsons, M.D. received his medical school education at Uniformed Services University of the Health Sciences, Bethesda, Maryland, with his internship and residency at the Bethesda Naval Hospital, now part of the Walther Reed National Military Medical Center. Prior to college graduation, Andrew Parsons, M.D. completed the 12-week US Marine Corp Officer Candidate School in Quantico Virginia.

170

Andrew Parsons, M.D. spent approximately three years as a Lt. Commander, USN, Medical Corps, working as an anesthesiologist in the operating rooms at Newport Hospital. Andrew Parsons, M.D. knew the local civilian hospital personnel. Andrew Parsons, M.D. returned as a civilian anesthesiologist for less than a year sometime between 2019 and 2020, after leaving Anesthesia Associates of MA, who lost the contract at St. Luke's Hospital, New Bedford, MA. Andrew Parsons, M.D. left Newport Hospital because of a sexual harassment claim brought against him by a nursing supervisor. The Plaintiff's book was stolen in August 2019 and was circulating at Newport Hospital during the civil employment of her ex-husband.

171

For the situation presented in this case, a book stolen through literary agency to prevent commercial publication, and all other activities resulting from it, the sphere of participates was exceedingly larger than could be imagined in both number and stature to deliver a desired outcome of the Defendants. The amount of defamation of character to the Plaintiff is not to be overlooked. The Defendants associated with the medical malpractice and insurance fraud are involved in this case in its entirety. They had a loyalty of collusion, aiding and abetting, misprision of a felony, accessory after the fact, and a general malfeasance levying high levels of professional stature and knowledge against a victim, the Plaintiff, without resources.

Summary

172

As presented in Exhibit A, a portion of an original work of fiction was electronically submitted to Esmond Harmsworth IV, through the Aevitas Creative Management submission portal on June 17, 2019 at 8:44AM.

173
On June 21, 2019 1:05PM an email reply from Esmond Harmsworth IV at
eharmsworth@aevitascreative.com asked for a full submission of the entire book. At 1:10PM, June 21, 2019,
the entire theft book was submitted electronically to eharmsworth@aevitascreative.com.

174
On August 12, 2019, Esmond Harmsworth IV emailed declining representation of the book, and closed the
opportunity for any further business with the Plaintiff regarding that particular book.  In April 2021,
Defendant Sandra Oursuloff said Esmond Harmsworth IV emailed the book thereafter to the Redwood
Library board of trustees, including her husband, Michael Holt Massey III, Roger Kass of the van Beuren
family, and "several" other people, thereby initiating a wide scale vector of illicit distribution that immediately
included Andrew Parsons, MD, who subsequently distributed it to over 80 persons connected to Anesthesia
Associates of MA/Plexus Management and Wesleyan University alumni.

175
The Plaintiff gave no rights, no permissions, no authorities, to anyone to read or hold the book. For several
years, people asked to review the book as a "reader". The Plaintiff said, "No." The Plaintiff had no reviewers
except for 50 pages at the Wesleyan Writers Conference, 2014. No one knew what the book was about. The
Plaintiff told people, including Defendants, Elizabeth Goddard, Elizabeth Kahane, Monique Burgess, Carl
Helmetag, Sandra Craig, Nora Diedrich, and others, "I'm writing a work of fiction that has an ensemble of
characters, set in Newport, RI."

176
The Plaintiff had no knowledge of any private group of individuals arranged by trustees, donors, and staff of
the Redwood Library who were vetting all fiction written in and about Newport, by its own insiders. The
intention of the group has been to suppress any, and all, voices inconsistent with the top one percent, the
equivalent of the Social 400, a term coined during the Gilded Age, and used to refer to the fashionable
persons of New York Society, many of whom had "cottages" in Newport, RI. The Redwood Library Book
Committee demonstrated "prior restraint is a censorship they impose to prohibit freedom of thought and
expression" guaranteed by the First Amendment.

177
First with the Redwood Library Book Committee, Hope van Beuren, Kamala's Table, then with Andrew
Parsons, M.D., and the Workgroup and their associates, the people collectively and individually
demonstrated a prior restraint to silence first the author's written work— a book, and then her voice
completely through the use of slander, harassment, abuse, incapitation; the tools and technologies of noise,
physical assault, sexual assault, other technologies; and the complete loss of civil liberties guaranteed in
through the First Amendment, Fourth Amendment, Ninth Amendment, and Fourteenth Amendment.

178
Not since Edith Wharton published *The Age of Innocence* in 1921, has there been an insider's view of Newport
in literary fiction. This was previously unknown to the Plaintiff. The Hope van Beuren perceives the Plaintiff
to write in a voice, lifestyle, and culture that befits their family. Hope van Beuren claims the Plaintiff has no
right to write in that style. She claims the author is a nobody, a nothing. She refuses to acknowledge the work,
or the author. She wants the book, and then the author, permanently annihilated.

179
They want the Plaintiff silenced for whatever she has written, especially any descriptions of a hospital in the
book. Newport has not seen a publisher-sponsored book since Edith Wharton's, *The Age of Innocence*, which
won a Pulitzer Prize for literature in 1921. Edith Wharton became the First Woman of Letters both in
publishing and Newport, Rhode Island. Playwright and author, Thornton Wilder published *Theophilus North*

privately in 1976. No publishing house would publish his semi- autobiographical work set in Newport in the 1920's. Both *The Age of Innocence* and *Theophilus North* are widely read today.

180

Hope van Beuren had an arrangement with her son-in-law, Roger Kass, to receive from Esmond Harmsworth IV, all books written by Newport residents, including summer colony regulars, and those who write about Newport from an insider's perspective. Hope van Beuren was said to give a personal $5,000 cash donation to Caroline DuPont, Redwood Library Development Director for the exchange of any book from Esmond Harmsworth IV. This is in addition to any grants and donations from the van Beuren Charitable Trust, an actively managed foundation which has granted over $100,000 million to the local community.

181

Esmond Harmsworth IV claimed he had 12 books similar to the Plaintiff's from the last decade. Jonathon Karp, CEO of Simon & Schuster, a stated guest at Esmond Harmsworth IV's stately home on historical Bellevue Avenue, Brown University alumnus, and stated summer regular at Redwood Library summer galas claims, he has 45 such books. Esmond Harmsworth IV received guest passes at private beach club, Sprouting Rock Beach Association for the exchange. Jonathon Karp claims to belong to a Secret Society, akin to Skull & Bones, Yale University, that is sponsored by House Ways and Means Committee, US Government. He was a member of Kamala's Table under the name David Dinkins.

182

Roger Kass said his mother-in-law, Hope van Beuren would pay him $3 million for a grossly edited copy of the Plaintiff's book for use in a number of instances. The purpose of the edited down version of the book was to discount the Plaintiff's abilities to author fiction, and to deprive the Plaintiff of her ability to work in a chosen field of business. While this was ongoing, the Plaintiff also could not secure a position in nonprofit fund development to raise monies for their budgets and endowments despite her resume as a longstanding local board veteran, management consultant, and possessor of the body of knowledge consistent with national Certified Fund Raising Executive (CFRE) qualifications including, but not limited to:  the van Beuren Charitable Trust, Newport Hospital, and Newport Art Museum. Roger Kass said Hope van Beuren would say pay up to $20 million for an edited book that could denounce the talent and credibility of the author.

183

The book has been valued in the publishing industry as worth at least $25 million payment to the author. With a potential market value of $3 billion, Scribner, Simon & Schuster valued the work to the author at $310 million, plus 38.5%, residuals, which is consistent with investment industry acquisitions. The author spent three years fulltime writing the work of fiction. The author and the title have world-wide recognition, and it can be published in over 60 languages. The Plaintiff would receive ten percent of the market value of the book plus residuals.

184

Prior Restraint was exercised by the federal government, specifically by the elected and appointed politicians involved in this case, Senator Mitch McConnell, Senator Chuck Schumer, whose wife is the COO of the New York Public Library System, Secretary Gina Raimondo, Congressman David Cicilline, Congresswoman Nancy Pelosi, and Kamala Harris. President Joseph Biden and First Lady Jill Biden were occasionally present at Kamala's Table. They all involved themselves in daily conversations. They represent collusions, aiding and abetting, misprision of a felony, and accessories after the fact.  All appointed and elected politicians, except Congresswoman Nancy Pelosi, have law degrees from schools as prominent as Yale, Harvard, and Georgetown. Kamala Harris was the Attorney General for the state of California before becoming senator. Secretary of Commerce Gina Raimondo was a Judicial Law Clerk for the Honorable Kimba Wood, U.S. District Court, Southern District of New York, and past two-term Governor of the State of Rhode Island. Kamala Harris took a strong leadership position in the suppression of the Plaintiff's book and for

working with <u>Alberto Villodo</u>, <u>Jonathon Karp</u>, <u>Rusty Powell III</u>, and members of the <u>Workgroup</u> to arrange restrictions on the Plaintiff, that included physical assaults, sexual assaults, and losses of liberties, especially privacy of all kinds, for the reminder the book needed to be conquered, quelled, and defeated.

185

First Amendment rights invoked with <u>18 U.S.C. §242</u>, Fourth Amendment rights, Ninth Amendment rights and Fourteenth Amendment rights to freely speak, write, and publish, and not be terrorized, tortured, physically assaulted, sexually assaulted, defamed, slandered, harassed, abused, incapacitated—murdered— killed for having written a book of fiction that takes place in Newport, RI, is the primary reasons given for the actions against the book and the Plaintiff, to guarantee a stamp of 'never to be published'. The use of force, blackmail, extortion, torture, and black magic technologies including a subversive technology to order the Plaintiff to kill herself by her own hand—as if she were instructed through Artificial Intelligence—in the real-time instruction of <u>Dominique Alfandre</u>, <u>Bethany DiNapoli</u>, <u>Monique Burgess</u>, and <u>Nora Diedrich</u> is a violation of First Amendment Rights, Fourth Amendment Rights, Ninth Amendment Rights, Fourteenth Amendment Rights, and <u>18 U.S.C. 242</u> in the extreme.

186

The Plaintiff classified her book as top secret while she was writing it. Once it left her desk for literary agency, prospective agents only saw up to the first 50 pages. She gave no rights no permissions, no authorities to anyone to read the book, except to <u>Esmond Harmsworth IV</u>, to solicit his agency. His family, a peerage of the United Kingdom, founded and owns the Daily Mail, London. He is a Brown University and Harvard Law School alumnus. For several years, people asked for details regarding the book. The Plaintiff never provided more detail to protect the story from public view and public dissemination of the story. She wanted to pleasantly surprise readers with a well-conceived story set in Newport, RI published by one of the best: Scribner, Penguin Press or Little Brown.

187

In 18 U.S.C S242 Deprivation of Employment, The Right to Earn a Living, the law explicitly states, "Whoever, under color of any law, willfully subjects any person… to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States," include the Plaintiff's rights to earn a living, is liable. However, almost every right and every civil liberty of daily existence was violated. The number of counts of civil liberty violations is difficult to count as the Ninth Amendment guarantees those we didn't even perceive at one time, such as the right to be free from the target of black magic and sorcery technologies, which are an absolute violation of ones' civil liberties. They are criminal technologies of the worst kind.

188

On January 11, 2023, Defendant <u>Timothy Hollister Esq.</u> said, "…No one should care anymore what she [the Plaintiff] does, day-after-day, yet they follow her endlessly through a form of remote surveillance and then find ways to harass her nonstop." This continues even as the Plaintiff prepares this filing, this Day April 3, 2023.

189

All Defendants also worked to block any legal defense from representing the Plaintiff. No attorney approached agreed to take the case. They all said they had a conflict of interest. Incentivizing promises of potentially high financial remuneration, involvement in landmark decision-making, or other professional trophies were not attractive enough to potential attorneys. The Defendants considered the Plaintiff blocked from due process, a success of their endeavors.

190

Now that the Plaintiff accepted the conditions of *pro se* litigation, the Defendants, through remote surveillance and other technologies (described elsewhere in this filing, and in Exhibit A), follow the Plaintiff's every word, every line of judicial preparation in real time. The Defendants can hear and witness what is being prepared. They demanded to know what the Plaintiff' legal strategy was so they could counteract it. The Defendants consider it their right to know what they will be charged with in a court of law, as part of their defense against any civil rights and criminal charges levied against them for their own actions. The Defendants violate the Plaintiff's rights to privacy, and right to a fair and just due process.

191

Bethany DiNapoli and Andrew Parsons, M.D. in particular, voiced the general response to any litigation brought by the Plaintiff:

> "Now, I will be sued in a court of law because I know exactly what my medical profession tells me not to do."   Andrew Parsons
>
> *"So why do you do it?"*
>
> "To best you like none before, and I thought I could best you and win, and get away with it because it was in the energy realm, and I did not have to own any of it. I was going to tell everyone you had a history of being crazy instead."
>
> Andrew Parsons 9:01AM May 20, 2022

192

As of the current day, April 3, 2023, not one Defendant seeks to settle out of court. There exists a culture of their own understanding that they will continue to best the Plaintiff and win a judicial position on some yet unknown merit, thus, excluding the Plaintiff from ultimate publication of the book; large financial settlements; freedom from loss of privacy; freedom from gross world-wide physical, financial remote surveillance; freedom from physical attacks that effect the Plaintiff's health in gross and minute ways especially the metabolism; freedom from sexual assault and sexual abuse; freedom from constant stress, threats, harassments, slanders, general abuses;  freedom from loss of consortium with her adult children; freedom to privately engage in physical intimacy with another; freedom from loss of enjoyment of life; and discriminations far and wide that prevent the Plaintiff from opportunities available to all others.

193

The Harry Potter book series did much to bring sorcery, magic and its craft topics into the mainstream global thought. Total revenue from the Harry Potter book franchise is known to be $7.7 billion, excluding licensing. The use of sorcery rites, formulas and technologies (hereafter, known as technologies) against another, requires the sorcerer, magician, witch, shaman to be initiated by another. Reiki healing energy practitioners do the same. Some people have no magic abilities; others are natural adherents. Many readers all want to become Harry Potter. Defendant Harold "Harry" Kahane, 21, has a Facebook page depicting and identifying himself as Harry Potter, the magician. The Plaintiff never read any Harry Potter book.

194

The terms sorcery, black magic and witchcraft are synonymous. The use of such sorcery technologies, includes anything that when aimed with right intention, effectuates a measurable or descriptive outcome in the physical realm. Most sorcery technologies are levied against another without the express grant by a citizen of a right or a permission. They are levied as weapons of ambush against another. The sorcerer demonstrates a power to compel specific actions the other does not possess. In some circumstances, sorcery technologies are levied as permissive rights to healings. In those cases, a sorcerer would call themselves a shaman. Throughout the world sorcerers and shamans are synonymous, with the distinction being that shamans practice a permissive healing outcome and a sorcerer practices an ambush or usurping of power against

21

another with a measurable or descriptive effect.  Most sorcerers claim not to know how to undo, repair, remedy, or redress the negative effects they themselves create.

195
The use of such technologies is not a right guaranteed under the First Amendment Rights to religious freedom. Sorcery/black magic/witchcraft technologies cannot be protected under the First Amendment as all are a weapon of mal-intent and violence. The technologies, when cast, take away civil liberties of a victim. It is an act of raw power over another. As a victim, the Plaintiff is protected from such technologies under the Fourth Amendment and Fourteenth Amendment. As an unstated civil liberty, if the Fourth and Fourteenth Amendments are hesitant to apply to the taking away of civil liberties by the use of sorcery technologies (which includes curses), the court has opportunity allow victims of attack through sorcery technologies to claim civil liberty violations under the Ninth Amendment.

196
The State of New York Penal Code 165.35 makes it a Class B misdemeanor to, "exorcise, influence or affect evil spirits or curses."

197
The nation's forefathers knew of sorcery as nine of the signers of the Declaration of Independence were Freemasons, a Secret Society. Secret Societies are elite membership-based groups where sorcery skills are introduced, witnessed, practiced, and codified. George Washington, Benjamin Franklin, and Andrew Jackson were Freemasons. Skull and Bones, a similar premier elite Secret Society at Yale University birthed three United States Presidents, George H.W. Bush, George W. Bush and William Howard Taft.  In 1828, there was a backlash against Freemasonry to such an extent that it became the impetus to found the political Whig party. The House Ways and Means Committee operates as a Secret Society within the United States government. All senior elected officials and their selected initiates are called into membership without permissions. Once in, there is no way out. It is currently chaired by Richard Neal, D-MA. Former Connecticut Congresswoman, Nancy Johnson, 85, Republican was the most senior ranking woman in Ways and Means history. She is from the Plaintiff's home town, and is known to the Plaintiff personally.

Anticipatory Breach of (Federal Law) Contract

198
Four defendants entered an oral agreement with anticipatory outcomes, promises made, and not fulfilled to the detriment of the Plaintiff.

199
Kimberley Witherspoon, Inkwell Management, on February 4, 2021 volunteered and agreed to be the literary agent of the Plaintiff. She was in possession of 50 email-submitted pages of the book from a January 2020 query seeking representation. Kimberley Witherspoon told the world she would sell the book. The Plaintiff had no prior association with Kimberley Witherspoon. The next day, they had a 1.5 hour verbal out loud conversation. Kimberly Witherspoon, the literary agent, interviewed the author, and agreed to represent her. As a reciprocity, the Plaintiff brought her into a small social group that shielded her with a form of Secret Society protection. This significantly augmented the quality of Kimberley Witherspoon's professional and personal lifestyle. Kimberley Witherspoon failed to perform in her agreement and verbal contract to sell the book.

200

Timothy Hollister, esquire "promised to God" numerous times to be her legal defense in federal court. He specifically asked her to write down many conversations attributed to himself. He claims he made a list of all the high-profile individuals and attorneys who appeared in the conversations to facilitate his own prosecution strategy and credibility in federal court. The Plaintiff is known to him personally and intimately. They dated for a few months in 1982-1983. Ultimately, Timothy Hollister, esquire claimed to have taken his own notes on numerous Workgroup Defendants. Then, in November 2022, and December 2022, he synergized with them. He became one of them. He began to berate and criticize the Plaintiff, especially her association with Harry Gural, who is not a Defendant. When the Plaintiff emailed and telephoned Timothy Hollister professionally, he claimed there was no way he could work with her. He also lied in an email and told her he could not take the case because he was a partner at a firm—which is a lie—and he could not go against a false association with another attorney at the firm in Providence, Rhode Island, who is a named Defendant. Her husband, Christopher R. Bush is an Assistant Attorney General for the State of Rhode Island. Timothy Hollister, esq. is currently "Of Counsel" at Hinkley Allen & Snyder, Hartford, Connecticut.

201

Defendants, Nancy Graham, SVP & Publisher Scribner's and Jonathon Karp, CEO Simon & Schuster entered into 24 unique contract discussions, with offers to buy the Plaintiff's book at a set price point. There was an existence of a valid oral contract with agreed upon documentation and language. There were acknowledgements of receipt, date-time stamps and witnesses.  They are presented collectively upfront in Exhibit A.

202

It is known to Defendants Nancy Graham, SVP & Publisher Scribner's, Jonathon Karp, CEO Simon & Schuster, and the Plaintiff, that the Plaintiff upheld her legal obligation to enter into contact and sale. The Defendants failed to perform. There was use of deception and concealment throughout the entire "bidding" process which was carried out unknowingly to the author by Kamala's Table, firstly through a forced bid with Pamela Dorman of Pamela Dorman Books, Viking Penguin— who was known to the author personally—and then through Nancy Graham and Jonathon Karp with the assistance of Mark Halpern, Universal Pictures, Carolyn Gilpin, journalist and author,  Tara Plochocki, esquire, and Cynthia Parent (Defendant of unknown whereabouts).  Pamela Dorman is not a defendant in the case.

203

Mark Halpern, for Kamala's Table, promised a contract by May 1, 2021 from Pamela Dorman. He led conversations suggesting all the spring and summer activities that the author would likely engage in as a result of the sale of the book, i.e. buying a new computer, facial rejuvenation, production assistance with a film adaptation, the purchase of a new car, and instant celebrity status, which the author never sought. The Plaintiff wanted the book to be the celebrity, not the author.

204

On June 25, 2021, at 10:03 PM, an *Acknowledgement of the Purchase* of *Barefoot in Heels* by Scribner's, Simon & Schuster was $310 million. Then, at 10:23 PM it was documented the *final paperwork contract* would be signed no later than July 15, 2021. Residuals were always pre-set at 38.5%, a well-known acquisitions percentage from the investment banking industry. The witnesses were Nancy Graham, SVP Scribner, Jonathon Karp, CEO Simon & Schuster, William Parsons, son of the Plaintiff, and Edward Heffernan, CEO Alliance Data, Plano Texas, personally known to the plaintiff.

205

The Plaintiff sustained injuries as a result of the breach of contract. The Plaintiff filed for a certificate of registration with the Library of Congress on July 14, 2021 at 8:08AM.

206

The Plaintiff sustained a hardship as a result of the loss of this contract. Professionally, the Plaintiff has no other source of income due to defamation of character initiated by Andrew Parsons, M.D. (2011) and his partner Catherine Wicks (by 2014); then by Grand Theft by the van Beuren family and the Redwood Library Book Committee with the Newport Hospital Foundation; then by Kamala Harris' group known initially as Kamala Nation and subsequently Kamala's Table. This preceded the Kamala Harris sponsored Workgroup. The defamation of character and all associated crimes have been ongoing to the present day, April 3, 2023, legal submission.

207

At least five resumes submitted to Newport-based philanthropies for fund development positions were unknowingly used against the Plaintiff because her literary book had already been stolen and viewed by the recipients of the resumes. This includes Nora Diedrich who twice read the Plaintiff's resume openly in Secret Society space to slander and aid and abet others to do the same; Elizabeth Lynn, Executive Director, van Beuren Charitable Trust who neither interviewed nor hired the Plaintiff because they were holding her stolen book; and Newport Hospital, who received three separate resumes from 2019 onward.

208

Nora Diedrich, who became a central person in the Workgroup that edited the Plaintiff's book for derivative distribution and sales, had been a member of Tom Hockaday's Secret Society where she listened nightly to Andrew Parsons, M.D. read and re-read the Plaintiff's illicitly begotten book.

209

Norah Diedrich was known to masturbate with Andrew Parsons, M.D., the Plaintiff's former husband. Andrew Parsons, M.D. took every opportunity to shame, blame, slander, harass and abuse the Plaintiff at Tom Hockaday's House. Others at Tom Hockaday's House were known to do the same. This targeted activity against the Plaintiff was a magnet that many could not pull themselves away from.

210

It was said repeatedly that Nora Diedrich wanted to openly date Andrew Parsons, M.D. She offered that she had an affair with an anesthesiologist, a married man, when she was living in Evanston, IL. That man, Raymond Schmidt, M.D. is known to both the Plaintiff and her ex-husband. No such affair took place. He, too, did his medical school training and residency at the National Military Medical Center, Bethesda, Maryland.

211

Andrew Parsons, M.D. ultimately married three women in Secret Society space: Carolyn Crosson Gilpin, Maura Lindsey, and Nola Ganem. These three women had unprecedented access to inquiry and knowledge regarding the Plaintiff. It was for use against her.

212

Andrew Parsons, M.D.'s seven-year relationship with Catherine Wicks, a real estate broker, waned in the summer of 2021. Then, a woman, Theresa Ferreira, a nurse, physically move into Andrew Parsons, M.D.'s home in late 2021-early 2022.

213

It was said Catherine Wicks did everything she could to help Andrew Parsons, M.D. understand his relationship with his ex-wife, the Plaintiff. It was said Andrew Parsons. M.D. would not agree to marry Catherine Wicks for a June 2022 wedding, as she had designed, until he had answers regarding the Plaintiff's book.

214

She directly aided Andrew Parsons, M.D. to obtain a copy of the Plaintiff's book. Together with Andrew Parsons, M.D., Catherine Wicks slandered the Plaintiff around Newport. The Plaintiff has facts and witnesses, particularly Patricia Peterson and Tory Peterson, at a cocktail party at the Redwood Library in January 2021. Catherine Wicks queried the couple about the Plaintiff's affair with a married man. They knew not. It did not exist.

215

Both Kamala's Table and the Workgroup engaged in secret society technologies that resulted in sexual assault, physical assault, emotional abuse including shaming and blaming, slander, ridicule, blackmail, and extortion i.e. "If you do not do the following act of masturbation, or tell us something about you we want to know, we will sexually assault you, or tell the world lies about you." This was the mantra of Defendants Dominique Alfandre, Bethany DiNapoli, Nora Diedrich, Monique Burgess, Caroline Gilpin, Nola Ganem, Andrew Parsons, M.D., Kayla Abbate, Elise Fagnoli, Alberto Villodo, Marcella Lobo Villodo, and others. They, and the other members of the Workgroup engaged in defamation of character actions, economic abuse, emotional abuse, social abuse, parental alienation, professional alienation, societal alienation, and the less of every right they could imagine.

216

As noted elsewhere, the Defendants also believed they could bid up a work and then rescind it through the creation of a fraudulent scheme that involved Kamala' Table, the Workgroup, Beatrice of York, and Catherine Middleton, whereby the Defendants would plagiarize the author's work to fraudulently publish overseas—Hong Kong, Singapore, Dubai and other locales selling counterfeit goods; publish privately in New York for their own known stolen book distribution channels; publish as an e-book for sale and distribution online; or for the use of Mark Halperin in film and television.

217

The Defendants would then tell the author her work appeared to be the work of another—that she had plagiarized her own work. The consequent fraudulent author would either be a known name to the Plaintiff, or a pseudonym created by Kamala's Table or Workgroup for the sole purpose of releasing the Defendants, Nancy Graham, SVP and Publisher of Scribner's, and Jonathon Karp, CEO of Simon & Schuster from the contract.

218

Jonathon Karp said he was introduced to Beatrice of York in Secret Society space, through her mother, Sarah Ferguson, a published author of historical romance fiction—often with a ghost writer; numerous cookbooks through Weight Watchers; children's books, and other nonfiction books. Many were published years ago by the Atria imprint of Simon & Schuster. The evidence that illustrates the involvement of, and claims presented here against Beatrice of York and Catherine Middleton, is in Exhibit A.

Copyright Infringement, Fraud, Commerce, Trade

219

Copyright protection in the U.S. exists automatically from the moment the original work of authorship is fixed in a tangible form of expression.

220

The year the original work was completed by the Plaintiff was 2015. The author, the Plaintiff, held on to the book for three years without doing anything with it. It sat in a Xeroxed box on a shelf, and in a personal electronic file. It was never submitted to any agent, publisher or reader of any kind. It was originally submitted to literary agents in June 2018, and then again in June 2019. The Plaintiff did not know the book was stolen by Esmond Harmsworth IV until February 4, 2021. It was copyright registered with the Library of Congress on July 14, 2021. This is *prima facie* evidence of the legal existence of copyright and authorship.

221

No copyright symbol or notice appeared when submitting to a literary agent. However, the Plaintiff footnoted every page of the book with her email address and telephone number. It clearly identified the owner at the time of first submissions to literary agents and any publishers bidding on the commercial publication of the work.

222

The only permissions granted to read or hold the work were literary agents who read the work as an electronic version in pdf format. The intent was for them to accept the work, and sell it to a mainstream large publisher.  Only two agents received a full electronic copy of the work: Jane Dystel, and Esmond Harmsworth IV of Aevitas Creative Management. Both sent email replies rejecting the invitation to represent the Plaintiff and her work.

223

The copyright infringement of the work since August 2019, and then of the registered work, July 14, 2021, has effected the ability to gain a literary agent. The Plaintiff submitted queries for literary agency in 2023, and no one agent responded to the solicitation of representation. The Plaintiff is unable to sell the book without agency. The Plaintiff's work appears to be blackballed by literary agency. Far too many agents, in the United States, Canada, and the United Kingdom all state they are "closed to queries" from persons unknown to them. The only persons they seek to represent are persons previously known to them through mutual third parties. They also will take on authors who are best sellers looking for alternative agency.

224

It is essentially impossible to be a debut fiction author and find proper representation of a book worth millions of dollars. Entry level agents do not have the standing in the industry to represent a book of the Plaintiff's market value.  The book and the author have worldwide recognition. Those who have illicitly read the book, have re-read at least two-three times, and up to five. They all claim, "It is not my cup of tea," a term first coined by Defendant, Anne E. Hamilton at Kamala Table, but they then say, "but I read the whole work and passed it on to a friend." The entire world stood by and watched during the summer of 2021 numerous Defendants and other associated parties, read the book openly into secret society spaces.

225

From September-October 2020, Andrew Parsons M.D. read the illicitly begotten book repeatedly, nightly, in a continuous replay motion, to any and all who would listen. Defendant William Martin said between 300-500 persons visited Tom Hockaday's House where Andrew Parsons, M.D. read the book. Andrew Parsons M.D. gave commentary while he read, and told everyone everything was true. Jessica Hagen decided she was one of the characters. People who listened with regularity knew the book well. This was well before the public readings in the summer of 2021. Defendants and others had favorite lines, characters and scenes. Pamela Dorman, SVP Viking Penguin suggested that once the book was commercially published, a yearly reading of the work similar to *Ulysses* and *Moby Dick*, might be appropriate and appreciated.

226

In February 2021, Kamala's Table went line-by-line, paragraph-by-paragraph, through the author's book. They sought to inquire first amongst themselves, and then with others, which lines were memoir and which

were literary fiction. They recruited persons who might know the facts of the authors life, and forced them with blackmail to claim a section as true, based in fact of the author's life. No one really knew, but they were forced into false confessions.

227

The book is not a memoir, not a roman a clef, not a literary memoir by another format. The work, while based in real life is purely fiction, and classifies only as such. <u>Grenville V. Craig</u> told the <u>Workgroup</u>, and anyone who would listen from December 2020 onward, that every word was true. <u>Andrew Parsons M.D.</u> told everyone at <u>Tom Hockaday's House</u>, that every word was true. Neither man could know, but the world listened to these men, and not the author. They claimed they knew everything there was to know about the Plaintiff, and vied in an adolescent competition, for who knew her the best. Then, they declared it to any and all who would listen. When in doubt over a topic, they fabricated an answer. The Defendants, and others, publicly in Secret Society space shamed, slandered, harassed, and abused the author for any line she wrote. <u>Grenville V. Craig</u>, 81, and <u>Andrew Parsons M.D.</u>, 60, would stop at nothing until the book was unpublishable, and the author destroyed and silenced.

228

From July – September, 2021, Defendants in the <u>Kamala's Table Workgroup</u> went line-by-line though the book. They debated and inquired, amongst themselves, and the world, about the veracity of the written word, memoir or fiction? <u>Kamala's Table</u> had just done the same. The <u>Workgroup</u> harassed the author about every line she wrote. <u>Tracy Jonnsen/Johnson</u> organized a gambler's betting parlor game of which lines were true and which ones were fiction.

229

The <u>Workgroup</u> rearranged—or edited out—lines and paragraphs to denounce the work, eliminate the author's voice, and make the work appear idiotic, unpublishable, a work without literary merit. In this way, the work could never progress to publication.

230

In September 2021, Defendant <u>Monique Burgess</u> created an e-book of the final edited copy, and put her name on the copy as the author. The Plaintiff is uncertain of the exact title used by <u>Monique Burgess.</u> The goal was to both upload the book to an online e-book selling platform for financial remuneration, and to deliver a copy of the edited version back to Defendant <u>Roger Kass</u>, of <u>Kamala's Table</u>, who would receive remuneration of $3 million by his mother-in-law <u>Hope "Happy" van Beuren</u>. <u>Roger Kass</u> said she was willing to pay him up to $20 million for the debased copy.

231

At the same time, September 2021, "<u>Diane Gilpin</u>" was said to be the author of the Plaintiff's work, not necessarily edited, for sale as an e-book on Google Play. It was said, <u>Diane McEnroe, esq.</u> known then to the <u>Workgroup</u> as <u>Cynthia Crosson</u>, was the entity <u>Diane Gilpin</u>. <u>Diane McEnroe, esq.</u> was working with Workgroup members <u>Cynthia Parent</u> and <u>Noam Zilberstein</u> to upload to Google.

232

<u>Noam Zilberstein</u>, 30, a PhD graduate student in computer science was an immediate past employee of Google. <u>Cynthia Parent</u>, 63, whose whereabouts and address are unknown to the Plaintiff, also claimed employment at Google. <u>Noam Zilberstein</u>'s mother was a bridesmaid in the Plaintiff's wedding. His mother's sister, his aunt, is a fiction writer. <u>Cynthia Parent</u> was a freshman year suitemate of the Plaintiff's in college.

233

Previous to this editing and reformatting of the work, <u>Caroline Crosson Gilpin</u>, sister of <u>Diane McEnroe</u>, also known to the Plaintiff freshman year in college, worked in April and May 2021 in a fraudulent scheme with <u>Mark Halperin</u>, NBC/Universal Productions, to reformat the Plaintiff's work as a screenplay. She was said to

have typed 100 pages of a screen play and sent it to NBC Universal, Los Angeles to create a disfavor of the work so that no producer would ever bid on a film version of the book. It was said several screen writers in Los Angeles all read the copy, and disliked the work, proving the fraudulent scheme created an outcome of reduced value, or no market value of the work in the film industry, thereby silencing the work and the author.

234

Mark Halperin, NBC/Universal Productions, a member of Kamala's Table, was also part of another fraud scheme to manipulate the market value of the book, to eliminate the ability of the author to sell it for commercial publication.  With Nancy Graham, SVP Scribner;  Johnathon Karp, CEO Simon & Schuster; Tara Plochocki, esq., Washington, D.C.; Caroline Crosson Gilpin, Columbia School of Journalism and children's book writer; and Cynthia Parent, presumed Google employee, Nancy Graham, SVP Scribner, could bid up a pre-contract of the book—$310 million with residuals at 38.5%—because regardless of interest in the publishing of the author's book by the author,  Nancy Graham would have the contract invalidated by proclaiming the author plagiarized the work. After running up the author's expectations for extreme remuneration for the work—something Mark Halperin did daily at Kamala's Table— prior to actually signing a contract with financial payments, Nancy Graham would announce to the author, "The work was plagiarized, and, as such, all contracts and financial remunerations are now null and void." Nancy Graham would have evidenced this through software that detects plagiarism.

235

Authorship would then have been assigned to either Mark Halperin or one of his designees. Mark Halperin then would be capable of using the author's work as his own, for his own professional and financial remuneration. The work would cease to exist as belonging to the author, thereby silencing her voice in publishing and film.

236

The Plaintiff is seeking the court's application of interpretation of 15 U.S.C. §2 for conspiracy to monopolize, attempt to monopolize and intent to monopolize an industry (both publishing and literary agency) against one person, a citizen of the United States who has the US constitutional and civil right to seek commerce. This is in collusion with state actors. While the Redwood Library Book Committee member, Defendant James said in the summer of 2021, (See Exhibit A), "[Plaintiff] you are not social enough in Newport to publish a fiction book," Kamala Harris, with Jonathon Karp, independently scaled that conversation through Kamala's Table and its associates to collude with other publishers and literary agents to exclude the Plaintiff from entry into the world of Big 5 publishing. Earl A. "Rusty" Powell III is the bridge between both groups.

237

To date, the Plaintiff has a spreadsheet, with date-time stamps, of over 60 literary agents she has queried for representation in the world of publishing. Most literary agents are not open to cold call queries from debut authors. She has queried literary agents from Los Angeles to Toronto, Canada, to New York, to Boston, to London, England. It is as if she has been blacklisted from agency, and thus publishing. Publishers and editors say they are not open to purchasing directly from authors unless they have close relationships. The literary agents are deciding who and what should, and should not be published. Without literary agents, the books are not published, and their subsequent films are not produced. The literary agents are directly deciding and influencing the literary cultural heritage. They hold the power over authors. In the past, many of these "readers" were the wealthy, the affluent, educated persons of the American aristocracy. Many summered in Newport, Rhode Island. It should not be overlooked that many books published are not well-received, such as Amor Towles's debut, Rules of Civility, which Kimberley Witherspoon didn't even like-and told the Plaintiff she would not like either— but she sold it anyway, to Penguin Books. Then, she took the second and the third books of that author, and sold them to the same publisher. An executive editor at Scholastic Books said in an audience participation format at Salve Regina University publisher, where the Plaintiff was in attendance, only three out of ten books make money. The publishing house binds the remainders for their own pleasure. The publishers rely on the three best sellers to float the remaining seven.

238

There is an inherent bias and discrimination –or intent to bias and discriminate—against the author for her work of fiction that takes place in Newport, by a Newport insider. However, the Plaintiff did not know the Redwood Library's Book Committee is the vetting venue to decide who gets to publish fiction from Newport, RI. These people have no credibility or standing in the publishing industry, and are committing offenses against the Plaintiff's civil liberties as well as fraud and other criminal offenses. They are their own private social group of association working fraudulently to wield influence in the world of literary arts and culture.

239

Defendants identified with the Redwood Library Book Committee include: Elizabeth "Lisa" Alexander Goddard-73/4 –a masters level graduate of the Newhouse School of Journalism, Syracuse University, Thomas P.I. Goddard-76?, Caroline Goddard-36, Katherine Alexander Fields-70, Taylor "Tobie" Fields-85, Sandra Oursuloff Massey-76, Michael Holt Massey III-73, Development Director Caroline DuPont-83, Executive Director Benedict Leca, PhD-59, Leora Maltz-Leca, PhD-49, James Ross, esq., Alice Ross, 61, Noreen E.M. Drexel O'Farrell, 62, Jacalyn Conklin Egan-76, William Egan-78, Susan Conklin Nance, Jerry McIntyre, esq.-81, Christine McIntyre-80, Elena Wilcox-66, Peter Wilcox-76, Esmond Harmsworth IV-55, Jonathon Karp-58, Caroline Briggs-62, and others not yet revealed.

240

Kamala's Table member Dorrance Hamilton Benson, 40 is also involved. Her husband is on the Board of Trustees of the Redwood Library.

241

All offenses committed relating to the Redwood Library Book Committee reference and refer to this group. In addition to their own direct offenses of receiving the stolen book from Esmond Harmsworth IV, distributing it to members for mark-ups and editing, then creating a master plagiarized and derivative copy by a pen name for distribution, sales, and profit in overseas markets—actions directly mirrored by the Workgroup, these Defendants collectively colluded with Kamala's Table and the Workgroup to shame, blame, slander, harass, and abuse the Plaintiff for these outcomes.

242

Elizabeth Goddard and Jacalyn Egan in particular spent many days slandering and harassing the Plaintiff. Both took a leadership position in speaking for the group. The McIntyre and Wilcox families are related. They colluded to play a deceptive game to defame the Plaintiff. The Goddard and Field families, too, are related. Carolyn DuPont, the immediate past Development Director, who retired at age 80, is the mother of Alice Ross who is the mother of three daughters who were in the Workgroup. Jacalyn Egan and Susan Conklin Nance are sisters.

243

Caroline Briggs was also in the Workgroup. She brought her daughter, Skelley "Daisy" Briggs, 27. She also brought James Ross and Alice Ross' daughters:  Harling Ross Anton, 29, Elizabeth Ross, 22, and Virginia "Tully" Ross, 27, and sisters: Allegra Chapman, 25, and Antonia Chapman, 27. While the Redwood Library deems the publication of a work of literary fiction to be verboten by a Newport insider, Skelley "Daisy" Briggs composes and sings country western songs on Spotify, You Tube and other places about Newport, RI. She spent ten years in private school with the Plaintiff' daughter.

244

15 U.S.C. §2 states, "very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." The Fourteenth Amendment to the Constitution

considered "the right to pursue any lawful trade or avocation, without other restraint than such as equally affects all persons, is one of the privileges of [citizenry]..." The First Amendment guarantees free speech.

245
Literary agency is the gatekeeper to publish at a Big 5 publishing house. The Big 5 publishers: Simon & Schuster, Penguin Random House, Hachette Livre, McMillian, and Harper Collins. It was said, without the backing of a Big 5 publishers, a book cannot be reviewed by platforms such as Goodreads (owned by Amazon) and Kirkus Reviews. Without the reviews, a book does not get the wide distribution in the global bookstore supply chain. Independently published books rarely get the reviews, nor the distribution. The Plaintiff does not seek independent publishing, as her work will not find its audience. The author also has plans to write and publish a nonfiction European historical biography, and a nonfiction wellness book.

246
The Fourth Amendment of the United States Constitution is a fundamental aspect of property rights. It does not allow the government to investigate persons and property without a warrant. In the home, there is a "reasonable expectation of privacy." It is the right of the people to be secure in their persons.

247
Kamala Harris, created a group of individuals called Kamala's Table as initiation and membership into a Secret Society similar to Skull & Bones, Yale University. It had its own initiation rites, training activities, and mission activities to draw people and skills together. Through its work as a group, the people reveal skills, character, and leadership. It entrains members to become either perpetrators or colluder's in scenarios that can cross the legal line of what constitutes acceptable behavior, all to reach desired outcomes.

248
At Kamala's Table, the married members arrived with their spouses. Four arrived with their adult children. The children were Harold "Harry" Kahane, 22, Nicholas S. Schorsch II, 35, and Dorrance Hamilton Benson, 40, Andrea Van Beuren, 57, Barbara van Beuren Glascock, 66, and Archibald van Beuren, 65. Once arrived, no one could leave except Nancy Pelosi, Hope van Beuren, the Plaintiff, and Alberto Villodo.

249
The Plaintiff arrived via Patricia Fernandez on February 8, 2021. Alberto Villodo accompanied the Plaintiff. The Plaintiff was never at Kamala's Table without Alberto Villodo, although he was there without her at night. Kamala's Table broke up in May 2021. The spaces they were meeting in could no longer contain them.

250
The outcomes of groups such as Tom Hockaday's House and Kamala's Table set the stage for future recruitments of new members and activities. Kamala Harris, Earl A. "Rusty" Powell, III, 6th-term— turned 7th-termed Congressman David Cicilline, D-RI, and Secretary of Commerce Gina Raimondo D-RI, immediate past two-term governor of RI, specifically created a deep government inquiry into the Plaintiff. All government records, property records, financial records, and an aim at health records were reviewed and privately revealed to members of Kamala's Table. It was an invasion of personal privacy. Together with all the lines and scenes in the Plaintiff's book, information was used against her toward a defamation of character toward an end result of incapitation. Members of Kamala's Table went on scavenger hunts to find people who knew the Plaintiff such as the best man and bridesmaids at her wedding.

251
Scavenger hunts were popularized in the 1940's by gossip columnist Elsa Maxwell. They regained popularity in Manhattan by Elisha Wiesel, the former Chief Information Officer at Goldman Sachs, New York and the son of holocaust survivor and author, Elie Wiesel. They became an ultimate Secret Society party game after midnight whereby couples re-coupled with others. By dawn, at the end of the game, one could do as one

pleased or imagined with one's new temporary playmate. The activities presented in Exhibit A hint at this in the case, but the Plaintiff was excluded from all such activities behind walls of noise.

252

In this case, the games began in earnest on June 19, 2021. Kamala Harris herself sponsored and oversaw many games at night through to the end of October 2021. During the day, Mark Halperin often led the group, which is how the term, "Shit Show Game Show" arrived. Everyone's behavior was referred to as one's shit show game show, as if it were a unique personality, or behavioral response. After several months of his daily leadership of this own game show, he was removed from the scene.

253

At Kamala's Table, anyone, who knew the Plaintiff, was forced to listen to the reading of the Plaintiff's book. They were forced to choose a section that they could validate as factual from the Plaintiff's life, thereby forcing the book to be a memoir rather than literary fiction. No member of the group would have known what was truth or fiction. Members were forced to admit to some twisted truth in the book just to get out of the situation. After numerous admissions, a profile of the Plaintiff emerged, but one that was not necessarily true to life, but might be true to fiction.

254

All Members of Kamala's Table were involved directly or indirectly. Primary actors were Kamala Harris, Mark Halperin, Earl A. Rusty Powell III, Roger Kass, Hope "Happy" van Beuren, Jonathon Karp, Patricia Fernandez, Ann Hamilton, Rebecca Bertrand, Kimberly Witherspoon, Carl Helmetag, and Paul McGreevy. These individuals are charged directly with all criminal activity associated with the stolen book, as described here and elsewhere in this case filing, and all losses of civil rights of the Plaintiff.

255

Other Members of Kamala's Table include: Congresswoman, Nancy Pelosi, Senator Charles E. Schumer, Senator Mitch McConnell, First Lady Jill Biden, President Joseph Biden. Andrea van Beuren, Barbara van Beuren Glascock, Archibald van Beuren, Dorrance Hamilton Benson, Elizabeth Lynn, Michael Fernandez, Nicholas S. Schorsch Sr, Nicholas S. Schorsch II, Shelley D. Schorsch, William Kahane, Elizabeth Wright Kahane, Harold "Harry" Kahane, David W. O'Leary, and Linda A. O'Leary who demonstrated a particularly cruel attack on the Plaintiff through 2023 that infringes on her First Amendment, Fourth Amendment, Fourteenth Amendment and Ninth Amendment rights to privacy and a woman's right to choose her own relationships and her own medical outcomes. She took to a version of slander and gossip as a way to ingratiate herself with a group of affluent, educated persons, when she is not. She has no college degree and was a retail shop girl prior to marriage. Her husband dated the Plaintiff.

256

On February 4, 2021, Andrew Parsons, M.D, 60 –the ex-husband of the Plaintiff, arrived at approximately 5:45AM to "shake" the Plaintiff awake. He arrived with Catherine Wicks, 64, real estate broker—his 7-year intimate relationship, Kathleen Abbate, 58 and Richard Abbate, 58 —immediate contiguous neighbors who had a grudge against the Plaintiff for the planting of a partial row of arbor vitae trees along a property boundary. The trees were to protect the Plaintiff's privacy as the neighbor's house and pool were both too close and elevated. The trees do not meet the legal definition of a hate hedge. These four individuals had been associated with one another at Tom Hockaday's Secret Society house since at least October 2020. As stated elsewhere in this failing, Andrew Parsons, M.D. read and re-read the Plaintiff's book nightly for all to hear, comment, discuss, slander, harass, and abuse the Plaintiff. Kayla Abbate, 30 was also in the background of this event.

257

Members of the Kamala Harris Workgroup and other accessory people were all previously associated and networked through Tom Hockaday's House. William Martin physically lives with Tom Hockaday, and

organized the nightly event. William Martin served on the Island Moving Company board of trustees with the Plaintiff. They have lived in Newport for approximately eight years. People had the presumption they were a homosexual couple from Washington, D.C., but only William Martin is homosexual. They have purchased, lived in, and sold over 20 houses together. William Martin, 66 is a retired bank examiner for the US Treasury. Tom Hockaday, 67 is a political consultant, who sites on local non-profit boards.

258
It was at this shake -awake, that the Plaintiff asked Alberto Villodo, founder of the Four Winds Society, a school of shamanic studies, and Tameen Saied, Chennai India—who is not a named defendant in this case, to help figure out why her body was visibly shaking in an unnatural full-body nervous system, cardio-vascular and metabolic response. It was a physical assault.

259
Alberto Villodo quickly had the four perpetrators identify themselves and state their business.

260
It was an event that brought the entire world into the conversation. The Plaintiff knew the next day that people in London, England, specifically Patricia Fernandez's son, William Fernandez—a former White House Intern under President Bill Clinton; employees of Tameen Saied in Chennai India, and Sharon Ramel's husband of near Melbourne, Australia, all were present to hear the conversation. The four perpetrators, the Plaintiff, Alberto Villodo, and Tameen Saied were household names instantly around the world.  It was said almost no one did not know the situation initiated by Andrew Parsons, M.D. and his collaborators.

261
It was at this event, which had an initial peak audience and dialog for 4.5 hours, that Andrew Parsons, M.D. revealed he had a copy of the Plaintiff's book illicitly begotten through the Redwood Library Book Committee that he had passed along to Kathleen Abbate, Richard, Abbate, and Kayla Abbate. He wanted the audience, the entire world to know that he did not need to go through the effort of writing a book as a re-torte. The event that morning was his response, his revenge, his retaliation.

262
Like Kamala's Table and the Workgroup—that arrived six-seven months later— the predecessor groups:  the Redwood Library Book Committee, and Tom Hockaday's House; Andrew Parsons, M.D. wanted the book and its author destroyed by any means possible. The use of shame, blame, slander, harassment and abuse was to be his stock-in-trade that day, as it had been since the Plaintiff had filed for divorce over a decade before.

263
Andrew Parsons, M.D. specifically said he would destroy the Plaintiff through defamation of character, domestic abuse, financial incapacitation, emotional incapitation, social network incapacitation and professional network incapitation because he insisted he had absolute proof the Plaintiff had an affair of intimate relations with Donald Jagoe; that the Plaintiff plagiarized the book; and that she previously an abortion. These three items alone were to seal the fate of the Plaintiff as defamed, shamed, blamed, destroyed in Newport, RI and around the world simultaneously in real time. Andrew Parsons, M.D. said it was important that the Plaintiff wear the shame she had worn since the time of the couple's divorce.

264
Andrew Parsons, M.D. spent from 2011 through present time slandering the Plaintiff about an intimate affair stating he had absolute proof. He insisted he could confirm he was not a liar. Everyone, everywhere believed him. No one asked the Plaintiff. His medical degree, profession, his tone and tenor gave him instant credibility. Except in this case, there never was ever an intimate affair had between the Plaintiff and Donald Jagoe. The only plagiarism was the fraudulent scheme for financial gain of Kamala's Table though Carolyn Crosson Gilpin, Tara Plochocki, esq., Cynthia Parent, Diane Crosson McEnroe, Mark Halperin, Jonathon

Karp, and Nancy Graham to produce a derivative work of the Plaintiff's book as both book and screenplay—which was written by Carolyn Crosson Gilpin, a graduate of the Columbia School of Journalism; and the fraudulent scheme of the Workgroup to produce another derivative work, an e-book for sale and distribution. That work was ultimately marked as authored by Defendant Monique Burgess, and Diane Gilpin, a pen name for either Diane Crosson McEnroe, esquire, 61, or her sister, Caroline Crosson Gilpin, 62. It is not to be overlooked the Redwood Library Book Committee had been doing the same group activity to review, edit, and produce a new derivative copy of the stolen work for production, distribution and sales overseas.

265
The entire accusation about abortion was an inflammatory, political, and a decisive offensive strike because Andrew Parsons, M.D., a political conservative, later said he could say or do anything as demonstratively as he pleased because in the grand mesa of the shamanic network that Nancy Moss, a national shaman teacher established for Alberto Villodo the morning of February 4, 2021, he, Andrew Parsons, M.D. would have no accountability, and no liability. He would leave no trace behind because the Plaintiff could prove nothing about what he said or did. He believed he was untouchable. If questioned, he would say the Plaintiff has a history of being crazy.

266
The entire question whether, or whether not, the Plaintiff had a termination of pregnancy performed previously became a wide-spread, wide scale scavenger hunt of its own of slander, harassment, abuse, and hate. Every person the Plaintiff ever knew, or dated, was questioned in and through the shamanic network about the presumed event. No one anywhere could be found to validate that they were there to witness such an event. The Plaintiff did admit that she worked for several months post college graduation for a physician in Hartford, Connecticut who performed such a procedure twice a week, fully within the law.

267
The scavenger hunt became a trophy game of besting another. Laurianne Florio, 63, Lorraine Florio Olson, 89, Diana Florio Beardsley, 57, David Johndrow, 63, Kaitlyn Johndrow, 27, Kylie McCullough, 43, Dina Karousos, 51, Susan Bistline, 50, Magdalena Johndrow, 34, Kristin MacManus, 42 played the scavenger hunt game with persistence and strategy to find an answer to whether she had a termination of pregnancy. They stopped at nothing to hunt down, to shame, to blame, to passive aggressively harass, and abuse the plaintiff. Kaitlyn Johndrow, 27 demonstrated a natural tenacity to destroy rarely seen in people anywhere. As documented in Exhibit A, dialog such as the following is not unusual.

268
"I, Diana Beardsley, 57, and I, Kaitlyn Johndrow, 25, will bash [her] head in until she screams bloody murder in this space. I will fry her koshas [the five layers of a human being] and bury her alive by scratching out her eyeballs."

December 14, 2021.

269
Sorcery technology is the only tool to achieve that end. They both had direct access to achieve it.

270
When Laurianne Florio, 63 and her mother, Lorraine Florio-Olson, 89, where forced to step back, Diana Florio Beardsley, 58 said she'd play for the family, as if implying the entire case scenario were a television game show. All these Defendants became the second tier of membership in the Workgroup. Some advanced more quickly than the others.

271
David Johndrow, 63 was to replace Andrew Parsons, 60 and take over his voice and dialog. The Plaintiff was in the wedding party of David Johndrow, but had not seen he nor his wife since 1990. Dina Karousos was

the Plaintiff's real estate broker, with a house on the market from June 2019 until December 2020. Magdalena Johndrow (sister-in-law), Kaitlyn Johndrow, and Kristin MacMannis had plans to start a "Kundalini Crossing" business as the opportunity to cash flow $3 million of activity.

272

The purpose of such a business is detailed in Exhibit A. It can be summarized here as the opportunity through one unique activity—for profit or non-monetary based—to identify individuals who would naturally coalesce as synergistic to put individuals on a mission that would force each ultimately to cross a line: personal, professional and legal. Tom Hockaday's House was this type of gathering, but it failed to scale itself and understand how to advance to the next level of the game. William Martin said Tom Hockaday had tried this type of gathering three times prior with other groups using masturbation, and failed. He could not advance himself out of his own situation. Tom Hockaday and William Martin were visitors to Kamala Harris' Table. They had private meetings with her away from members of Kamala's Table.

273

For this second tier, replacement group of the Workgroup, members would aim to replicate the game they had played with the Plaintiff, and re-start it all over again with new people. The Plaintiff would remain in the same victimized position. Monique Burgess and her entrepreneur husband, Thomas Burgess, and their children, Cole Burgess and Cameron Burgess wanted to create the same business opportunity. Caroline Briggs and Skelley Briggs also wanted to create the business for Long Island, New York. This group, except the three Florio family members and the Briggs women, were all at Tom Hockaday's house together. Caroline Briggs is said to be member, or a member-in-waiting, at the Redwood Library Book Committee. She is a Miss Porter's School alumna, an heir to Skelley Oil, Texas.

274

Many sorcery and magic curses were used to deliver a truth about the Plaintiff in a situation. Alberto Villodo, an informal member of the Workgroup who arrived with Nola Ganem, plied his shamanic craft through various means to "scratch at" the Plaintiff to deliver an answer. He helped Nola Ganem, Kathleen Abbate, Kayla Abbate, and himself, and others to physically harass and assault the Plaintiff to prove he could win the trophy of a confession about an abortion from the Plaintiff. Except, the Plaintiff had no confessions, except that she worked for a physician, post college.

275

The Defendants, all Workgroup members and their associates, demanded they would get a confession regarding an abortion, one way or another. Andrew Parsons, M.D. claimed he demanded a confession of the Plaintiff because he had to prove to the world he was not a lair. Except he was. They all were in every situation. They violated the civil rights of the Plaintiff under the First Amendment's rights to her own religion and moral code—it is not an ethical dilemma;  the Fourth Amendment's rights to privacy in the home with regard to physical intimate relationships—a theme that would re-emerge later with the right of the Plaintiff to have an intimate relationship in the privacy of her own home with Harry Gural, a man she previous had an intimate relationship with in past years;  the Fourteenth Amendment's right to privacy and bodily integrity which is her right to make her own decisions regarding her medical care and its outcomes; and the Health Information Portability and Accountability Act's (HIPAA) right to privacy in medical care and procedure.

276

It is a personal civil liberty of the Plaintiff to choose one's health care and medical procedures, regardless of the procedure. The Plaintiff is protected under HIPAA with regard to a medical doctor, a physician, releasing private health care documentation or its information to anyone, let alone a world-wide audience. In this case, the physician is the Plaintiff's ex-husband seeking revenge. Not only did Andrew Parsons, M.D. presume a piece of medial knowledge, he once again claimed he had absolute proof. But, he had none. He swore it was in her medical chart. He was her doctor. It is not. He insisted. So did the Defendants in the Workgroup. Together, they went on a rampage to use every tool of shamanic practice, sorcery, or black magic—physical

and psychological assaults—to prove a point that they, and only they, held all the power over the Plaintiff, and that by her own hand, the Plaintiff was now a defamed, shamed and blamed woman of low moral character and ethical standard, a rag doll, a woman who neither belonged in Newport Society nor the Library of Congress. By these actions, the Defendants believed the Plaintiff deserved no book deal for commercial publication, nor a place in society. They wanted her to move out of Newport, Rhode Island.

277
This question of abortion—while appearing to feed the hate crime—feed a frenzy of daily activity that no one would back down from. The answer is a civil liberty privacy right of the Plaintiff's. The answer belongs to no one other than herself. During this entire timeline of events, from February 4, 2021 to present, the historic Supreme Court decision Roe v. Wade was overturned, causing even more alarm, as if Andrew Parsons M.D.'s shot across the bow of domestic abuse was politically motivated.

278
It was difficult to discern who benefitted more from this attack against the Plaintiff about a presumed abortion. Was it members of Kamala Harris's Table, such as Hope van Beuren, 89, or The Redwood Library Book Committee, especially Elizabeth Goddard, 74, who wasted no time slandering and harassing the Plaintiff over it, or Jacalyn Egan, 75, who took a lead in April 2021 to demonstrate the Plaintiff was a liar, a cheater, a whore, or Alberto Villodo, 74, who used it to demonstrate his supremacy as the top global shaman, or the Workgroup to demonstrate raw power, or Andrew Parsons, M.D., an ex-husband to prove he was no liar, just a pawn?

279
It was a revenge they all sought for disparate reasons, especially for writing a work of fiction that was set in Newport, RI by an insider, and for divorcing a husband who did not understand why he was an ex-husband. It should be stated that the landmark decision of Roe v. Wade was issued on January 22, 1973. This was at a time when Elizabeth Goddard and Jacalyn Egan were in their mid to late 20's, potentially already married with children. Abortion was never a topic of consideration in high school or college for Elizabeth Goddard. She took the absolute moral high ground exception to the topic in her positon of privilege and moral refinement as an alumna of Miss Porter's School, Farmington. Jacalyn Egan herself was married at age 20 to a student at Fairfield University. While Elizabeth Goddard raised her family on a trust fund, Jacalyn Egan and her husband, William Egan, created a substantial financial endowment. They presumed their age and financial privilege insulated themselves from such a topic.

280
Because Andrew Parsons, M.D. had such a demonstrative declaration of needing to force a confession from the Plaintiff, many individuals stepped up to try their hand at winning a trophy that became larger than life itself. It infiltrated many conversations, daily across all the people involved in the conversations. Defendant Linda A. O'Leary, aka Lyndsey Grant, with her sister-in-law, who is not a named defendant in the case, spent many months attacking the Plaintiff regarding this topic. She declared the whole scenario was true because she herself confessed it at Kamala's Table. She said she knew it from her husband, David O'Leary. He said nothing about any such topic. This led the Workgroup, especially Andrew Parsons, M.D., Nola Ganem, Carolyn Crosson Gilpin, and others to scream and shout, "Abortion, abortion David O'Leary," at the Plaintiff almost daily, especially if she were in any kind of intimacy with Harry Gural.

281
Exhibit A provides description, details, and summaries of dialogs created by Andrew Parsons, M.D., Nola Ganem, and Carolyn Gilpin regarding slanderous defamation of character against the Plaintiff of the topic of abortion, which were legal when the Plaintiff as in high school and college. They have violated the Plaintiff's civil liberties of privacy in all these matters. They used sorcery violence to prove a point and force a confession. They used the abortion topic as a default for any other matter or conversation, whereby slander, harassment, abuse, or defamation of character was required.

282

Andrew Parsons, M.D.  became the perfect illustration for Kamala Harris and Nancy Pelosi who both said at Kamala's Table, we demonstrate leadership by telling others to get the work done, but we never tell them how to get the work down. We take no responsibility for how the work gets done. Andrew Parsons, M.D. willingly became the perfect scape goat for effectuating the outcomes desired by Kamala's Table, the Redwood Library Book Committee, Newport Hospital, the Workgroup, Tom Hockaday's House, Tara Plochocki, esq. and other associated players. He was so hell-bent to destroy the Plaintiff, that he assumed the least desirable position.

283

The other members of Kamala's Table, directly or indirectly, are charged with collusion, and aiding and abetting to destroy the opportunity for the author to publish her book at Big 5 publishers, and to destroy the author's character, her finances, her associations with family, friends, associates and strangers. They also are charged with misprision of a felon, and accessory after the fact.

284

The primary actors of Kamala's Table sought a "kill" in a Secret Society game that seeks to incapitate its target, who is this case is the Plaintiff. It is detailed throughout Exhibit A. It began with a so-called party. This is a Ways and Means initiation opportunity.

285

The "party" was held for the Plaintiff on February 19, 2021. It was led by a new initiate, Secretary of Commerce Gina Raimondo, who was not inaugurated into the federal appointment until March 3, 2022. With the help of Kimberly Witherspoon, they invited the Plaintiff's sister, and two couples who were presumed to be "friends" of the Plaintiff, to fete the Plaintiff alongside the membership of Kamala's Table. Mark Halperin had a major speaking role during the event. The Plaintiff was not invited, even though the party was in her honor. As is typical with this event, held for most newly initiated individuals into Ways and Means, someone tells the feted person, they will repeat it in the future with more in attendance. It never happens. It is a scavenger hunt and treasure hunt for the group. In this instance, for Secretary Gina Raimondo to find out as much as possible about a target. They fete. Then, they move to destroy the target.

286

Exhibit A also describes what is referred to as  the I Am Kamala Game, or the I Am Kamala Game of Sexual Orientation or just The Game.  It is described in Exhibit A by Kamala Harris herself. When asked the origins of the game, Kamala Harris had no comment. In 2023, it was learned it is rooted in the rites within Secret Society's such as Skull & Bones, the Knights Templar, and Freemasonry.

287

As described by Kamala Harris, to enter into The Game, an individual has to be of an orientation to want to best another, to win a position of power.

288

The Game has six levels:
1. Sexual intimacy alignments and re-associations
2. Fraud
3. Drugs
4. Guns
5. The Kill
6. Recruitment and Replacement

289

Once an individual has achieved a kill in the game, the person can advance to another group with a more challenging target to prove their skill at leadership and delivery of the game. The kill is an incapitation, wholly or in part. Exhibit A details the description.

290

In this case filing, Defendants have said, "If I can best Pamela Chapman, then I can be Kamala Harris." Carrie Crosson Gilpin, 62, and Tara Plochocki, esq., 42, both played that game. It drew Monique Burgess, 56, in one summer morning in 2021. Then, she never left. They lived by the mantra, "I Am Kamala Harris because I bested Pamela Chapman."

291

Another example of how an individual played this out included the following from Nola Ganem.

292

Nola Ganem said "The reason I could not stand down yesterday after Kamala Harris married me to Alberto Villodo was because I am going to best Harry Gural and Pamela Chapman by having intercourse with Harry Gural physically, thereby besting Pamela Chapman. Then, together Harry Gural and I would both block her book, and a movie."

293

Then, Nola Ganem would go to the doorstep of Kamala Harris and say, "I have hand-delivered to you both a movie and a book that you wanted blocked, and I screwed both Harry Gural and Pamela Chapman. Now I am Kamala Harris. I bested Kamala Harris and I am her through and through. There is no one else like me for you—Harry Gural, and I am now Kamala Harris. I will never step down, and I will always reign supreme in the United States of America, the government of the people. This is Nola Ganem."

294

Earl A. "Rusty" Powell, 79, could be the bridge between Kamala Harris, Ways and Means, Social Newport, and the Redwood Library Book Committee. A long-standing Director of the National Gallery of Art, Washington, D.C. from 1992 – 2019, he was a longing standing observer of Ways and Means. He subsequently was Chair of the United States Commission of Fine Arts, appointed by President Obama.  He belongs to several private associations in Newport making him a true "member of the club."

295

Earl A. "Rusty" Powell III could set up the initial membership of Kamala's Table for Kamala Harris, the newly inaugurated Vice President. He claimed to be the mentor of Jonathon Karp in black magic and Ways and Means. He could seeded the game for Kamala Harris with a media target—a book, the van Beuren family, and the Rhode Island governor and congressman. He had followed the Plaintiff for ten years on behalf of Grenville V. Craig who was performing black magic on the Plaintiff without her consent.

296

Grenville V. Craig brought the Plaintiff into a private Secret Society space with Donald Jagoe in July 2011. He was silent for one year prior, then declared himself present with his wife. He said he used the year to create a playbook of the Plaintiff's life. The Plaintiff had no idea where she was. She had no skill at all. She could not escape. She could not talk to anyone else, or receive information except from Donald Jagoe, who refused to acknowledge his presence. He did not talk in complete sentences. He mainly only asked questions. She was a prisoner in a game she could not get out of.

297

Donald Jagoe colluded with Grenville V. Craig and then Sandra Craig to keep the Plaintiff in a position of victimization, naiveté, and no validation. The Plaintiff spent ten years as target practice for Grenville V. Craig

and <u>Earl A "Rusty" Powell III</u>.  <u>Donald Jagoe</u> went on in this game to be a perfect collusion and source of aiding and abetting for <u>Jean Gorham</u> who became the lead female sorceress of Newport. Always seeking raw power in Social Newport, <u>Jean Gorham</u> a former head mistress of a now defunct girls school in Newport, lives off of a trust fund that she claimed was worth almost $1 billion. <u>Donald Jagoe's</u> wife, <u>Jane Hicks Jagoe</u> was a core member of the <u>Workgroup</u> and spent two months working in the group to edit the Plaintiff's book to create a derivative copy. <u>Donald Jagoe</u> pulled her out in September 2021.

298

The Plaintiff was the target and mission of activity for <u>Kamala's Table</u>:  To recruit persons of professional and financial stature known to the Plaintiff to gain insights on the author's life—every detail imaginable—especially sexual intimacies and financial accountings— and secure that the Plaintiff's book, stolen through literary agency, could not be commercially published currently, or in the future, illicitly distributing it unreasonably and without rights or permissions by the author.

299

The strategy was for an ultimate Level 5: The kill in a game, yet to be revealed, that would ensure incapitation across all aspects of life:  professional, financial, social, emotional, physical. This work was set up in July 2019 when <u>Esmond Harmsworth IV</u>, literary agent, denied via email representing the Plaintiff to a publishing house, and then subsequently illicitly distributing it to groups called the <u>Redwood Library Book Committee</u>, the <u>Newport Hospital Foundation</u>, the <u>van Beuren Charitable Trust</u>, and <u>Tom Hockaday's</u> House.

300

The Plaintiff was pulled into <u>Kamala's Table</u> on February 8, 2021 by <u>Patricia Fernandez</u>, who was seeking favor of the Biden-Harris administration of a political appointment for her husband, <u>Michael Fernandez</u>, to a senior posting. That is when the entire situation for the Plaintiff scaled to where government intrusion by state actors could have stopped the entire game. They did not. The state actors, and their associates, used the game as a vehicle of initiation for the vetting of leadership and its opposite. The game is an unprecedented opportunity for power, control, and manipulation. It has been used by Secret Societies for centuries, and the United States Government, particularly House Ways and Means.

301

All activity against the Plaintiff was set up by the groups listed above, with ultimate control by <u>Kamala Harris</u>, who could have stopped the game at any time. <u>Alberto Villodo</u>, <u>Earl A. "Rusty" Powell III</u>, <u>Jonathon Karp</u>, also had the skill to stop the game, and the sorcery technologies that deliver unique outcomes. <u>Jean Gorham</u> ultimately could have stopped the sorcery technologies. The <u>Workgroup</u>, and its extension, was sponsored by <u>Kamala Harris</u> who delegated authority to organize it to <u>Tara Plochocki, esq.</u>, and <u>Caroline Crosson Gilpin</u>.

302

<u>Kamala Harris</u> herself oversaw many nighttime activities of the <u>Workgroup</u>:  scavenger hunt games that used shamanic marriage as a tool, and Kundalini Crossing. <u>Kamala Harris</u> was at the start of Kundalini Crossing on June 19, 2021. <u>Tara Plochocki esq</u>. was its gatekeeper.  <u>Kamala Harris</u> closed it down by October 31, 2021. By that time frame, the more involved individuals where initiating others to take over, which is Level 6 of *I Am Kamala Game*: Recruitment and Replacement. It proves skill level and demonstrated leadership through the recruitment and training of others.

303

Kundalini and masturbation are used in the first level of the *I Am Kamala Game* to realign the intimacies of an individual with a partner –not normally chosen—to achieve desired outcomes in scavenger and treasure hunt games. The scavenger hunt-kundalini /masturbation cycle is rooted in individuals, through a kundalini initiator, who by circumstance of the initiation, tags a new recruit through physiologic pulsation. This constant pulsation triggers the vagus nerve of the human body, guaranteeing the organ systems of the human body to be outside the state of "rest and digest" and relaxation. As a tag, it encourages the individual to

"chase" another until the individual releases themselves through human sexual orgasm in masturbation or in kundalini coupling practice.

304

In mid-October, under Kamala Harris, Andrew Parsons, M.D. was initiated as a kundalini initiator. He now "belonged" to the arsenal of Kamala Harris for any current and future needs of the Vice President of the United States of America.  She oversaw appointing Caroline Crosson Gilpin through shamanic marriage to be his handler. Kamala Harris also oversaw the initiation of Nora Diedrich's son, Timothy "Quinn" Delaney, 30 as a kundalini initiator. Monique Burgess was assigned by Kamala Harris to be his handler.

305

As one of his first assignments under Kamala Harris, Kamala Harris appointed Andrew Parsons, M.D. to initiate Cole Burgess, 23, Chandler Moore, 30, and Robert Ford Bauer, 30, Quentin Warren, 67, and Grenville Craig, 81 to become kundalini initiators. It should be noted Chandler Moore and Robert Ford Bauer attended private independent day and boarding school for over nine and thirteen years, respectively with the Plaintiff's son. Kundalini initiators are always men. Woman are assigned as handlers and become the main, and only, sexual partner, removing the men from other relationships and encouraging behaviors that question moral turpitude.

306

Once a kundalini initiator has the experience, the game requires they acquire a group, mainly women, to lead, manage, and facilitate various scavenger and treasure hunt games, and to sexually satisfy the kundalini master himself. They all meet in designated groups until they break away and realign with others, as they progress through the six stages of *The Game*.

307

In July/August 2021, Kamala Harris and Rusty Powell walked as spectral beings through the Plaintiff's home starting from the basement upwards punching out ceiling tiles and looking in every corner for US currency kept in the house. Based on slanderous assaults of every detail of her life from Grenville V. Craig, Kamala Harris was looking for several thousand dollars in cash. Grenville V. Craig has an impeccable ability to memorize long strings of numbers and complex information. His context is not always correct, nor of the right tone and tenor. His slanderous perspective is used to gain positive attention. It's his trophy that says he, Grenville V. Craig, can reign supreme in this secret society game that he wanted to play in college, but was never of the right persuasion. He is Harvard, not Yale.

308

Grenville Craig, a billionaire born in Newport, Rhode Island, and of Rome Italy, Miami, Florida, New York, New York, Paris, France, and Monaco, the Principality, offered several confessions in Exhibit A. The confessions speak are in his own voice and speak for themselves. It involves his daughter Caroline Craig, Yale University alumna, who was a part-time member of Kamala Harris's Table and the managing director of the family business, Tiverton Investments. She is the one responsible for monetary transfers in the investment portfolios. Grenville V. Craig and Sandra Craig could have monies that exceed the endowment of Harvard University, which was reported to $50.9 billion in 2022.

309

Since at least the fall of 2020, Kristin MacMannis was reading aloud central banking software in a Secret Society room organized by Tom Hockaday and Bill Martin. It contained upwards of 300-500 visitors and potential members. She was announcing the Plaintiff's "cash burn" spending and account summaries in real time.

310

Grenville V. Craig said, the Plaintiff kept several thousand dollars hiding in her cupboards, and insisted the money was there. Kamala Harris with Rusty Powell walked through the house harassing the Plaintiff in front of a world-wide audience, and physically and mentally assaulting the Plaintiff with black magic technologies to force the Plaintiff against her will to reveal where presumed money was hiding. The ultimate goal was to gain an absolute understanding of the ultimate net worth of the Plaintiff to calculate when The Plaintiff—without income as an author or fundraiser, would be financially "zeroed out," financially incapacitated. The ex-husband, Andrew Parsons, M.D. said he wanted her living in a homeless shelter to make her regret divorcing him.

311

At the same time, Kristin MacMannis was reading the Plaintiff's real time financial banking records from a central banking software portal in Tom Hockaday's and William Martin's Secret Society room, the Plaintiff's ex-husband of over ten years, Andrew Parsons, M.D. was at the same location, nightly reading and re-reading her illicitly begotten book which he received through Michael Holt Massey III, a Redwood Library trustee who received it directly from Esmond Harmsworth IV.

312

Carolyn Gilpin, Cynthia Parent, and Tara Plochocki, esq. were tasked by Kamala Harris to form a new group of that could be initiates to vet them for this project and potential projects in the future. Once proven as a useful member of the group, an individual never leaves.

313

Their first task was to edit the book and create a new edition for distribute and sales online. In September 2021, Monique Burgess put her name on the edited book as the author of a newly produced e-book based on the Plaintiff's work. Diane Gilpin was the second name used as an author of an e-book version of Barefoot in Heels.

314

Tara Plochocki, esq. was drawn to a group of Island Moving Company's—renamed in 2023 as Newport Contemporary Ballet—dancers, staff, and associates. The Plaintiff had been on the board of trustees of this non-profit from May 2017 – December 31, 2020. She was known to them as the chair of governance and nominating for the board of trustees.

315

The base of the Workgroup included Defendants: Peter Bramante, Tara Plochocki esq., Tara Gragg, Jana Hicks Jagoe, Lauren DiFedes, Tracy Jonnsen/Johnson. In the summer of 2021, at night, these individuals especially Peter Bramante and Lauren DiFedes targeted the Plaintiff with black magic technology that would vibrate the body and cause various physical imbalances. It is documented in Exhibit A. They would do this for multiple consecutive hours. Peter Bramante's goal was to "fry" her. He also said he was using her financial information to fill out credit card applications. He is the Executive Director of the non-profit.

316

Peter Bramante taught Andrew Parsons, M.D. how to tag-teamed each other to keep the Plaintiff's body on high alert from 10:15PM to 7AM. Gabrielle Bernstein was also there. She contributed, and then stepped back. As a master teacher of kundalini yoga, she provided inside knowledge about what the men were doing. It's described in Exhibit A. She could have stopped this action. She did not. To stop something would be inconsistent with the culture of kundalini yoga, which is not yoga at all. It is an aggressive, abusive initiation into the global Akashic Record space, known to shamans, and psychics. It is also the space of Secret Societies, and Tom Hockaday's and William Martin's space. It is the space of Skull and Bones of Yale University, Freemasonry, the Knights Templar, the Illuminati, and the space of Ways and Means of the United States Government.

317

The Fourth Amendment provides the civil liberty of the Plaintiff to be left alone, to have the right to her privacy in her own home. The Fourteenth Amendment guarantees the Plaintiff's rights to life, liberty and the pursuit of happiness. The Ninth Amendment applies to all other civil liberties not previously mentioned.

318

In the summer of 2021, during the daylight hours, Kamala Harris's Workgroup members were initiated into spy tactics, known as remote surveillance using sorcery/black magic technologies. When initiated by another, in this case by Alberto Villodo, one can actually remote view another through the third eye. One can see as either a still photograph or as in a movie camera, a moving imagery in real time. It can also call up past images of a particular memory or piece of information or data. The Plaintiff cannot do this. All members of the Workgroup were trained in these abilities. Every member of the Workgroup incessantly followed the Plaintiff day and night. They followed the Plaintiff until they were skilled enough in their ability, satisfied an urge or desire to know something important, insightful, or personal about the Plaintiff, or were forced to stop –which was sometime after January 1, 2022. The most predominant Workgroup members following the Plaintiff were Nola Ganem, Maura Lindsey, Elsie Fagnoli, Carolyn Gilpin, Kathleen Abbate, Andrew Parson, MD.— the ex-husband. Nola Ganem was known to follow the Plaintiff's every literal move for days, weeks and months.  With Andrew Parson, M.D., it was domestic abuse.

319

Other members the Workgroup included: Katherine Gilpin, 30, Tara Plochocki, esq. 42, Diane Crosson McEnroe, esq., 61, Noam Zilberstein, 28, Cynthia Parent, 63/64, Christine Bush, esq., 53, Lauren DiFedes, 35, Bethany DiNapoli, 58, Monique Burgess, 56, Cameron Burgess, 23, Dominque Alfandre, 65, Nora Diedrich [Delaney], 67, Timothy Quinn Delaney, 30, Erin Delaney, 3367, Francine Weiss, PhD, 49, Caroline "Dolly" Briggs, 61, Skelley "Daisy" Briggs, 27, Allegra Chapman, 25, Antonia Chapman, 27, Elizabeth Ross, 22, Virginia "Tully" Ross, CFA, 17, Harling Ross Anton, 29, Kayla Abbate, 30, Kathleen M. Abbate, 58, Tracy A. Johnson/Jonnson, 45, Tracy Ann Moore, 64, Chandler Moore, 30, Merrill Maloney Allen, 36, Leslie R. Grosvenor, 60, Shauna S. McGuire, 66, Nancy Whipple Grinnell, 74, Jana Hicks Jagoe, 76, Jean Gorham, 89, Alberto Villodo, PhD, 74, Marcella Lobo Villodo aka Helena Eve Kreil, 63, David Johndrow, 63, Dina Karousos, 51, Laurianne Florio, 63, Kaitlyn Johndrow 27, Magdalena Garczynski Johndrow, 34, Robert Ford Bauer, 30, Quentin Warren, 67, Wendy Schmidt, 67.

320

The Workgroup—with the encouragement of Kamala's Table state actors and members Roger Kass and Rebecca Bertrand—condoned the actions of breaking and entering into the home, voyeurism, third party sex, stalking, blackmail, extortion, aggravated sexual assault/rape, physical assault, and torture. At no time did these state actors and their shaman, sorcerer, black magician associates stop the actions that were causing excessive pain and suffering of the Plaintiff.

321

Each member of the Workgroup was given a minimum of one walk through the Plaintiff's home as presumed spectral beings to assess the lifestyle of the Plaintiff, and learn the environment of Plaintiff's home:  how it was laid out, what was in it, and how the Plaintiff moved about through it. The women of the Workgroup, under the expertise of Defendant Maura Lindsey, owner of estate liquidator, Trésor Estate Sales, spent two weeks itemizing, cataloguing, and describing the contents of the Plaintiff's home. She itemized, and then with the Workgroup researched online, the source and the value of every item. She decided the contents of the Plaintiff's home were worth $30,000 on the open commercial market, if the home were to be suddenly emptied. Every woman became research focused, some to the point of obsession, to learn the source and price of everything of the Plaintiff's.

313

Through the remote surveillance "photography" of Alberto Villodo, Maura Lindsey said she made a list of the titles of all the books in the Plaintiff's office. They said they were also reading the financial documents on the floor of the office, the surface of a table, a desk, and on a framed bulletin board. Maura Lindsey was prone to ask the Plaintiff unique questions about some of the items. For example, "Is that really a Century chair? Where was your glass reindeer purchased? We can't find your faux plants on line, where did you buy them?"

314

As mentioned previously, several Workgroup members stalked the Plaintiff in her home with remote surveillance. The remote surveillance reached a peak of invasion of privacy in the bathroom, where not only did they want to know, the volume and frequency of the Plaintiff's bowel movements, descriptions of her excrement, and urine output, they watched her talk a shower, dry off, and stand at the vanity in bathroom. Nola Ganem wanted to know the brand of cream she used for her face, which was a prescription. It was identified through remote surveillance. Nola Ganem researched the prescription online to find a diagnosis from which to tag the Plaintiff, as a way around medical records privacy. Yet, that is an invasion of civil liberty privacy and the Health Insurance Portability and Accountability Act.

315

For several months beginning in the fall 2021, the Plaintiff was badgered and bullied daily while taking a shower in her bathroom. Naked in the shower, Bethany DiNapoli, Dominique Alfandre, Nora Diedrich and Monique Burgess, Nola Ganem, and Maura Lindsey, practiced a form of sorcery technology akin to video voyeurism, whose source would have been Alberto Villodo.

316

Dominique Alfandre claimed she wanted the Plaintiff to masturbate with them as a group. Dominique Alfandre and Bethany Napoli, in particular, used multiple forms of blackmail and extortion to make that happen, but the act never occurred. They both demanded a display of the act because Grenville V. Craig claimed she masturbated in the shower. The Plaintiff is a kundalini energy practitioner, which is the physiological opposite of masturbation. It is akin to being a master yin yoga adherent.

317

The women of the Workgroup criticized the Plaintiff's naked body in the fashion of sexual harassment, sexual abuse, and domestic abuse. They said, the Plaintiff was the fattest size two they had ever seen. It was never safe for the Plaintiff to take a shower or change her wardrobe, except in the pitch dark of a room.

318

In the privacy of the Plaintiff's home, she had no privacy to read her computer screen, text message, make a private telephone call without having the number, the person and the conversation blasted through the Akashic Record realm. If the Plaintiff dared to read a book, they followed along and read aloud with her, often faster than she could read it herself. Only if the Plaintiff's read aloud— so they could all hear her—did they stop. If the Plaintiff watched film at night, the Workgroup whispered questions they demanded answers to. It was so harassing, such an invasion of privacy, the Plaintiff stopped reading and watching film. These are two activities of high priority and opportunity to and for the Plaintiff. The Plaintiff's inability to privately read, write, were think are directly linked to Alberto Villodo. By his own shamanic rites, he made that happen. It should be noted that Alberto Villodo, wanted to be internationally renowned as a shaman healer. He assigned all sorcery and black magic to his wife, Marcella Lobo Villodo. She performed all his sorcery so as to remain the healing shaman. History is replete with the understanding that shamanic rites and sorcery curses are two sides of the same coin.

319

Alberto Villodo, PhD, 74, revealed himself to the Plaintiff in mid-January 2021 to settle a confrontation the Plaintiff was having with his student, Annette Burke, a woman the Plaintiff knows, but is not social with. At that time, he swore his word was his bond. He was the founder and president of the Four Winds Society, an educational foundation of shamanic studies, head quartered in South Miami, Florida.  After settling the issue, he never left.

320

Alberto Villodo was available and present on February 4, 2021, and February 8, 2021, when the Plaintiff was shaken wake, and then when she was arrived without consent at Kamala's Table, respectively.

321

Alberto Villodo and the Plaintiff had pleasant and collegial daily conversations. That all changed on March 8, 2021, when a rite was performed to make Alberto Villodo her mentor in the energy realm. He promised he'd be her mentor as she was completely without skill. He in return, became, in his Peruvian tradition, a 'wisdom keeper', a graduation from earth keeper.

322

A week later, the Plaintiff learned at the time of the rite, she became Alberto Villodo's sacred wife. This was against her wishes and consent. He promised he'd buy her numerous outfits of clothing online from Mindy n Me. He promised when he died, she could have all his money, which he valued at $100 million. He promised the Plaintiff and her two adult children that he would take them all to Cusco, Peru and hike up the Indian Trail to Machu Picchu. He said he lived in a $20 million house in Bug Sur across the street from the ocean, owned a large estate in Argentina, owned the Big Sur, California property that belonged to Escalen which is a large piece of property on the water in Big Sur, and drove a Mercedes sports convertible.

323

In March 2021, when the Plaintiff had a Shen massage, he badgered the Asian masseuse, and said, "Don't touch my shamanic wife." At hair salons he did the same thing. He made a pest of himself with all her relationships. With Kimberley Witherspoon, a Brown University graduate, the Plaintiff and she played a game which proved the Plaintiff and Alberto Villodo had nothing in common.

324

On March 8, 202, the rite of mentorship was performed. After that moment, the Plaintiff's whole life changed dramatically for the worse. As documented and described in Exhibit A, Alberto Villodo, performed sorcery and black magic curses that took away all her privacy. She could not read, write or think without Alberto Villodo knowing everything in real time.  She begged almost daily for him to return it. He did not.

325

The Plaintiff begged Alberto Villodo for privacy to balance her monthly bills and financial statements. He refused. He listened to the first song on the radio in her car every day. He spoke to her while she walked the beach daily for exercise. He spoke to her every time she was naked in the shower. He set a noise in motion whereby he would know every time she returned to the privacy of her own home from being out of her house. The noise still exists on March 28, 2023

326

Alberto Villodo colluded with Mark Halperin of Kamala's Table. While he would not give the Plaintiff five minutes of privacy to write personal financial checks each month, he gave Caroline Crosson Gilpin almost a week of private time to retype the Plaintiff's book in a fraud scheme. In May 2021, the Plaintiff and Alberto Villodo agreed to a shamanic divorce, so he could marry another woman he desired. The woman did not materialize. He did not return her privacy.

327

Alberto Villodo never offered any actions or knowledge that mirrored mentorship to the Plaintiff. Ultimately, Alberto Villodo mentored the entire Workgroup, including the plaintiff's ex-husband. His word was not his bond, as he previously promised.

328

For this case filling, Alberto Villodo ultimately became the led male sorcerer, and Jean Gorham became the lead female sorceress. They held absolute power, which they welded consistent with the mal-intentions of Kamala's Table, the Redwood Library Book Committee, the Workgroup, Tom Hockaday's house, and any other sub-factions.

329

Exhibit A contains numerous confessions of Alberto Villodo, which he freely gave. They are in his own voice. He speaks for himself.

330

The Defendants committing a loss of privacy through sorcery technologies of constant remote surveillance – visual and hearing—denied the Plaintiff the right to vote without oversight. This is a violation of Title 52-Voting and Elections Subtitle I-Voting Rights, 10101 (b) & (c), of the constitution which guarantees a right to vote to participate fully in American public and civic life.

331

The principle actors implementing and committing actions through the sorcery technologies were:  Alberto Villodo, Marcella Lobo Villodo, Earl A. "Rusty" Powell III, Jonathon Karp, Kamala Harris, and Jean Gorham. They would allow everyone everywhere and anywhere to know in real time who, what, and how the plaintiff was voting in a private voting booth. The intentions were to inform, intimidate, threaten, shame and blame.

332

Title 52-Voting and Elections Subtitle I-Voting Rights, 10101 (b) states: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other persons to vote for, or not to vote for, any candidate… "

333

Under Title 52-Voting and Elections Subtitle I-Voting Rights 10101 (c), the Plaintiff seeks preventive relief through injunction and civil actions.

334

The Plaintiff is under duress in all situations and circumstances including the creation, and preparation of this legal case. It is all the same situation. Complete and utter loss of privacy in every moment and whereabouts of daily living. It is an abandonment of Constitutional and civil rights.

Other Privacies in the Home

335

According to Justice Brandeis in Olmstead v. U.S. (1928): "The makers of our Constitution understood the need to secure conditions favorable to the pursuit of happiness, and the protections guaranteed by this are

much broader in scope, and include the right to life and an inviolate personality—the right to be left alone—the most comprehensive of rights and the right most values by civilized men. The principle underlying the Fourth Amendment and Fifth Amendment is protection against invasions of the sanctities of a man's home and privacies of life. This is recognition of the significance of man's spiritual nature, his feelings, and his intellect."

336
From March 2021, and onward, the Plaintiff had noise and disrupted sleep. Disrupted sleep by itself increases stress, outward and oxidative cellular stress as shown through chronic inflammation, a condition the Plaintiff spent 4 years minimizing in her body, only to see her sleep cycles, metabolism—lack of vagus nerve "rest and digest, sleep cycles, and muscle stiffness return. The noise aggravates all of this and includes harming her brain waves, which had been at a consistent level of mediation—a condition impossible to hold with the constant noise. The noise also affects the cardio-vascular stress, nervous system stress, affects the skin and ability of the body to repair itself. It stimulates an ongoing stress response. The noise also pushes the metabolism to be on a higher level of activity, at the opposite end of the spectrum of rest and digest.

337
The Plaintiff noticed noise does not stimulate any adrenaline response to the noise, only a metabolic response, which would then shift and imbalance the circadian rhythm of the body, disrupting sleep. Since there is constant loud hymn near the Plaintiff's ears, the body is in a constant state of vibration, with lower range vibration feeling like a nervous system activation and a higher range simulating pulsation. The body cannot function properly if it is pulsing all the time, nor can it function properly with noise.

338
Around October 3, 2021 the Plaintiff acquired a pulsing approximately three inches below the belly button. Kamala Harris removed it for the Plaintiff, and countless other people at the same time, at the demand of the Plaintiff. Defendants Monique Burgess and Dominque Alfandre, in particular, took a great exception to the removal of the pulsations in the body. They spent over a year trying to put it back in the Plaintiff. These Defendants paired pulsing with masturbation, and insisted the plaintiff masturbate one way or the other. The Plaintiff never did. They used blackmail, extortion, slander, harassment, and abuse as their tools.

339
The Plaintiff had a routine of taking various supplements for wellness. She had been taking turmeric for her blood pressure, an ozonated magnesium, and several other preventative supplements. The noise aimed at her created such an imbalance in the digestive system and metabolism that she could no longer digest the supplements routinely taken took for several years. The turmeric was essential for maintaining her low pressure, and the ozonated magnesium was essential for maintaining proper bowl functioning and cellular cleansing. In the absence of these supplements, the Plaintiff did not take her blood pressure, as a measurement, to maintain her own privacy with health data. By July 2022, in the absence of certain supplements, the Plaintiff had a hemorrhoid situation. The pain took her directly one night to the Newport Hospital Emergency Room.

340
During the intake evaluation, the Plaintiff characterized the pain as a ten-out-of-ten pain—which is a physician's metric. She left with the insight it would heal itself in approximately ten days' time. The pain lasted five weeks. The Workgroup, together with either Jonathon Karp or Earl A. "Rusty" Powell III, magnified the intensity of the pain through sorcery and black magic. It was not enough that they caused the situation in the first place, the Workgroup intensified it through black magic to closely watch what would happen if the Plaintiff could no longer tolerate the pain. It was a voyeuristic torture tactic to see how the Plaintiff would respond. The Plaintiff writhed in sheer physical pain. The Workgroup anticipated this response would precipitate the Plaintiff's own demise, her own downfall, her own shame. In such events of torture, the only place to go, to ratchet up the game, is physical death. A true kill in the game.

341

It was such an extreme pain, the Plaintiff could not stand up, sit down, nor lay down for any period of time without extreme discomfort. For the five weeks of extreme pain, members of the <u>Workgroup</u>, who swore they all spoke in one voice, taunted, shamed, harassed, and abused the Plaintiff. Not only did they use sorcery and black magic to make the pain more intense, they pulsed her rectum. They harassed the Plaintiff every time she tried to defecate, and eat in her situation. They also knew she could not stand, nor sleep well. It was a level of torture beyond a Geneva Convention tolerance. It was also a gross invasion of privacy.

342

Defendant <u>Grenville V. Craig,</u> 81, a self-made billionaire alumnus of Harvard and MIT and former commodity's trader, who traded his US citizenship for one in Rome, Italy in approximately 2016, had been remotely surveillancing the Plaintiff for ten years through <u>Earl A "Rusty" Powell III,</u> 79, a Williams College graduate with a PhD form Harvard University. <u>Grenville V. Craig</u> performed every type of sorcery curse on the Plaintiff he could through <u>Earl A. "Rusty" Powell III</u>'s mentorship.

343

<u>Grenville V. Craig</u> and Defendant <u>Andrew Parsons, M.D.,</u> 60, had what could have been described as a smack down adolescent contest to determine who knew the Plaintiff better. This began in September 2021. <u>Andrew Parson. M.D.</u> consistently said he participated in the entire scenario to learn and reveal who the Plaintiff was, because after living with her for over 25 years, he claimed he did not seem to know her, and he demanded to know her before marrying another. <u>Catherine Wicks,</u> 64, was in complete collusion with that mission. Each man vied for the top position as the one who knew the Plaintiff best. <u>Grenville V. Craig</u> is a master storyteller who likes spin a good yarn. A good yarn neither presents the proper context nor the truth, but it puts the narrator in the spotlight. As described in Exhibit A, <u>Grenville V. Craig</u> has confessed several times, in his own words, to what he did against the Plaintiff. He also confessed to what everyone else did, as if he was willing to confess to anything if it earned him an important position in the story, and the respect of <u>Earl A. "Rusty" Powell III,</u> who held more power.

344

As part of their display of male bravado, they ultimately turned the contest and the storytelling to the Plaintiff's bodily functions and secretions, especially eating, urinating, and defecating. The <u>Workgroup</u> became obsessed with what went into her body, and then what came out. The Plaintiff often suggested that they graph these functions for their own clarifications. <u>Grenville V. Craig</u> mentioned the daily use of hydro-colonic therapy at an extreme price point as a remedy to post-menopausal constipation. No one actually witnessed the Plaintiff in this practice. <u>Grenville V. Craig</u> seeded this story to such a point that he said—and then the Workgroup mimicked—that that Plaintiff stuck her hands up her butt daily to pull excrement out. The <u>Workgroup</u> taunted the Plaintiff daily about the need to stick her hands up her butt. This whole conversation which when coupled with the noise—which destroyed the Plaintiff's ability to properly digest supplements and other wellness rituals—helped to seed the hemorrhoid situation.

345

As witness to the conversations, Newport Country District Court <u>Judge Colleen Hastings</u> said, domestic abuse begins with slander, harassment and abuse such that women stop taking care of themselves. This trajectory of behavior was exactly what <u>Grenville V. Craig</u> and <u>Andrew Parsons, M.D.</u> achieved together. They both considered the Plaintiff their wife: one in the Secret Society space, one in legal divorce.

346

Both men disavow any responsibility or support for anything the Plaintiff does in her life, especially in her health and wellness rituals, something the Plaintiff developed post-divorce, 2012. The Plaintiff asks the court to consider that both men, <u>Grenville V. Craig</u> and <u>Andrew Parsons, M.D.</u> as evidenced in Exhibit A, violated the Violence Against Women Act of 1994, also known as the Domestic Abuse Act. This includes stalking, financial manslaughter, emotional abuse, and other forms of obsession and incapacitation. Through the

Workgroup, these men, in practice, made their obsessions and insecurities, a culturally ingrained group practice. The Workgroup was to be replaced over time by what was termed Thievery Group II. Many of those members, Defendants in this case, spent days, weeks, months, years shadowing, mirroring, and mimicking the men and the Workgroup against the Plaintiff to achieve these same outcomes.

347
The Plaintiff spent two years changing her general diet and lifestyle to fight chronic inflammation, and 4 years doing daily yoga. This lifestyle is impossible to uphold while being held while in this unusual constant surveillance with noise. The amount of electronic noise focused on the Plaintiff has caused significant imbalance in the Plaintiff's overall health. The consistent use of a medical grade spa infrared light sauna was shown to provide improvements, but at a cost not consistent with her monthly cash flow.

348
Any wellness regime the Plaintiff had established in the past, the Workgroup gossiped about, shamed, blamed, slandered, harassed and ultimately abused the Plaintiff about. This forced the Plaintiff to spend copious hours educating those listening to effectuate a better understanding. It was to no avail. As Defendant Andrew Parsons. M.D. said to the Plaintiff in February 2021, it didn't matter what the topic was he presented, nor which response the Plaintiff gave—truth or a lie, he would "beat her over the head with a board and a bat" until she was "buried in the ground". He wanted her to feel his shame from their divorce, and he wanted her completely shamed in-front of a world-wide audience in real time to reveal her own defamation of character. This would completely satisfy his desire to seek a retaliation and revenge for the book the Plaintiff wrote, that he himself stole through his relationship with Catherine Wicks who obtained it from a friend, Sandra Oursuloff and her husband, Michael Holt Massey III, who obtained it directly from Esmond Harmsworth IV.

349
It should be noted the Plaintiff had copious notes that she took over the last ten years that she wanted to use as the research for a wellness book she intended to author. She also had the understanding that once published as a wellness author, she could consult with individuals one-on-one to provide unique price-point services. It was unknown to the Plaintiff that Sandra Craig and Grenville Craig took copious notes on the Plaintiff and her research. Sandra Craig and Grenville Craig followed the Plaintiff to such an extent that they also copied the notes she herself typed or hand wrote.

350
While a billionaire and well-educated, Grenville V. Craig had no stature, but he served on the board of the Redwood Library. Grenville V. Craig is a direct descendant of William Vernon, an 18th century merchant in the slave trade in Newport. Grenville V. Craig today holds proprietor share number two in the membership of the Redwood Library. With Earl A. "Rusty" Powell III", Grenville V. Craig has been a past member of the private Sprouting Rock Beach Association.

351
Grenville V. Craig has a unique ability to memorize long strings of numbers and facts. In the summer of 2021, and then again when he arrived at the Workgroup and realized he had the attention of all who could listen, Grenville V. Craig downloaded every piece of information he ever had on the Plaintiff, including financial bank account numbers, social security number, and what she would write in a wellness book. Grenville V. Craig wanted to be the one noted as the expert on the Plaintiff: He and only he studied her, followed her, and could report back on her. This trophy for him to be perceived as both an expert leader on a topic of much interest in all media, and as a mentored "spy" of Earl A. "Rusty" Powell III whose validation Grenville V. Craig was seeking. With the Plaintiff, Grenville V. Craig was always able to either claim everything she knew as his own, stolen directly from the Plaintiff, or that he was a top caliber spy, worthy of a Secret Society membership. But, he was Harvard, and Skull and Bones was Yale. He said one day,

"but I didn't get the opportunity to do this in college." That was said long before anyone understood the Yale Skull and Bones Secret Society organization.

352

Grenville V. Craig often said, "[The Plaintiff] no longer needed to write the wellness book. I gave all her secrets, all her key strategies away for free. She is no longer able to make any money from her own research, her own knowledge, her own life path. No one needs the book any longer. I gave it away so she could not do anything with the information. I own her and the information. I win my trophy. She is redundant and no longer able to make a living in the wellness sector."

353

This is exactly the same pattern as the Redwood Library Book Committee, Andrew Parsons, M.D., Tom Hockaday's House, Kamala's Table, and the Workgroup. Independently and collectively they all sought the same outcomes thorough similar situations.

354

As described in Exhibit A, during the summer of 2021, Grenville V. Craig gave away every piece of financial information possible on the Plaintiff including her social security number, which the entire world seemed to have memorized. He himself is paranoid about financial and physical security for himself and his family, yet he has no regard for the security and privacy of another. He used the skill of Earl A. "Rusty" Powell III to help him achieve this complete and complex picture of the Plaintiff. Combined with the central banking software that Kristin MacMannis had access to through a previous position at US Trust, Andrew Parsons, M.D. the ex-husband, Dina Karousos, the real estate broker of the Plaintiff, and others had a real time understanding of the Plaintiff's checkbook and investment portfolio balance any day they inquired.

355

Together, these individuals, who all met initially at Tom Hockaday's House, and then in the Workgroup, had a strategy to determine when real financial hardship would hit the Plaintiff. The Plaintiff's cash-burn rate was an obsession of the Workgroup. It was also researched at Kamala's Table. The former husband, Andrew Parsons, M.D. went so far as to say, that since he could not incapitate the Plaintiff in a hospital mental ward, the he would make sure she ended up in a homeless shelter to prove she was better off in life while married to him. Kamala's Table would applaud this strategy as they insisted she would have been better off had she never written a book of fiction that is set in Newport, RI.

356

Exhibit A documents and describes a situation whereby Defendants Monique Burgess, Dominique Alfandre, Bethany DiNapoli and Nora Diedrich imagined a scheme that with the help of Alberto Villodo and his sorcery skill, they would implant a pre-recorded scenario of pre-meditated death in the Plaintiff, which would allow these women to direct, to dictate, to the Plaintiff, at some moment of time in the future, exactly how, when and where she would kill herself. As a suicide, they schemed, they would bare no responsibility for the Plaintiff's pre-meditated death. Under the leadership of Dominque Alfandre and the imagination of Monique Burgess, who said she got the idea from the book, *Midnight in the Garden of Good and Evil*, they each came up with an idea for how the Plaintiff would kill herself: an ice pick, a serrated knife, foraged toxic mushrooms, and another. When these women told the Plaintiff the plan, and they knew she was writing it all down, they said, they were not legally liable for their intentions because the Workgroup all spoke as one, in one voice, and as one voice, they all could not be arrested for the intentions of just the four of them. This was a reoccurring mantra of the Workgroup: no one was responsible for their intentions or actions because they all worked collectively together. Kamala's Table and the Redwood Library Book Committee worked the same way.

357

While the Fourth Amendment states "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated," the Fourteenth Amendment has concluded (United States v. Lanier) "… that sexual abuse violates a recognized right of bodily integrity as encompassed by the liberty interest protected by the 14th Amendment. In this case, the Plaintiff presents the right to "equal protection under the laws" such that the privilege of life, liberty or property cannot be deprived." The Plaintiff seeks the civil library right to be left alone.

358

The Plaintiff presents the civil liberty right to her own bodily integrity. Physical assaults, sexual assaults, and aggravated sexual assaults occurred daily—mostly— from the summer of 2021 to present day.

359

The Fourteenth Amendment's right to privacy, and bodily integrity extends to First Amendment rights to one's own religious beliefs, and includes the Fourth Amendment's right to privacy in the bedroom including partnership intimacies, their outcomes, and their effects, and the privacy of women's health issues as covered in The Health Insurance Portability and Accountability Act (HIPPA) of 1996. The Ninth Amendment could extend to prohibit the use of sorcery curses and technologies, which are measureable, repeatable, and universal across all cultures and historical time periods, as the resource for the mission, means, and mechanism to achieve all these civil rights violations.

360

The Ninth Amendment could also consider that if a woman's rights to privacy in her own home, including couple's intimacy, are covered in the Fourth Amendment—and if a woman's rights to bodily integrity are covered under the Fourteenth Amendment, and what she chooses as her outcomes to those physical intimacies as her right to choose, then the Plaintiff's broad civil rights have been violated over a presumption that medical care sought over the presumption of an outcome to physical intimacy should be freely shared public knowledge in order to accuse, defame, shame, blame, slander, harass, and abuse such that the Plaintiff's First Amendment rights to her own religious practices are unjust, amoral and deserving of public ridicule. The Ninth Amendment could guarantee the civil right in conjunction with the First Amendment, the Fourth Amendment, and the Fourteenth Amendment, in conjunction with HIPPA such that no one can ridicule, slander, harass, abuse, or incapitate a woman for her private right to choose the procedures and outcomes for her own health, especially if they result from physical intimacies. The court is obligated to protect them, even if they're not explicitly mentioned elsewhere.

361

Article 17, ICCRR of the United Nations Human Rights Committee place a high moral obligation on the US government such that "No one shall be subjected to arbitrary or unlawful interference with his privacy, family, home or correspondence, nor to unlawful attacks on his honor and reputation. Everyone has the right to the protection of the law against such interference or attacks."

Justice Kennedy reaffirmed for Lawrence v. Texas, 2003, "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and the mystery of human life…The petitioners are entitled to respect for their private lives…"

362

As demonstrated in Exhibit A, physical assaults included everything from, but are not limited to, Defendants Monique Burgess and Bethany DiNapoli "scratching out" the Plaintiff's eyes to make her fatigued enough to step away from her computer—but which gave her an annoying subconjunctival hemorrhage in the eye— to

Defendant Bethany DiNapoli impairing the Plaintiff's two legs one night –which took two weeks to recover from, to Defendant Jonathon Karp pulsing a vein in the left calf whenever he wanted attention, to Defendant Roger Kass performing and errand of Kamala Harris that had a physical bodily effect of throwing a rock over the left eye on the far left of the eye brow, to Defendants Grenville V. Craig, Andrew Parsons, M.D. and David Johndrow, and then by extension the entire Workgroup, biting the Plaintiff's inner cheek, and or lips daily, whenever the Plaintiff chewed, to Grenville V. Craig twisting the plaintiff's ankle previously when she walked in three-inch clogs, and Grenville Craig grinding the Plaintiff's teeth to such an extent the Plaintiff told him he would break her teeth, if he did not stop, to the Workgroup members pulsing her body. Exhibit A describes physical attacks with date-time stamps and witnesses.

363

Jean Gorham repeatedly said the Plaintiff would be raped every day of her life moving forward. What began in August 2019, accelerated in September/October 2021 and is ongoing.

364

These are the occurrences, as previously documented by the Plaintiff in Exhibit A. They are based on the Plaintiff's actual physical experiences. The sexual assaults, aggravated sexual assaults, and rapes were outcomes of intentions by an individual, and then by the Workgroup as a unified group, that sorcery and black magic technologies enabled as manifestations in the physical. At no time did the Plaintiff ever consent to the experiences. Each and every experience was an uninvited ambush. The Plaintiff had no control to stop, reverse, or immediately recover from any assault. Often it took hours for the Plaintiff's physical body to return to an unstimulated state.

365

The first episode of sexual assault occurred about 9:30AM on morning in February 2021. The perpetrator was Defendant Sandra Craig, 71/2. She claimed she arrived with her three daughters to fondle the pubic area of the Plaintiff as a form of education. She said she wanted her daughters to have the experience of fondling another woman. Alberto Villodo put a stop to it for the Plaintiff.

366

The second episode, with multiple subsequent daily occurrences, arrived in August 2021 through the work of Defendant Tracy Johnson/Jonnson, 45. She was stimulating the Plaintiff's pubic area with an intent to create organism through sorcery. It was meant to simulate penetration. It is detailed in Exhibit A.

367

In September 2021, Defendants Monique Burgess, 56, Bethany DiNapoli, 58 and the Workgroup built on the episodes of Tracy Johnson/Jonnson, 45. They are documented in Exhibit A. They were made manifest through Defendant Marcella Lobo Villodo. When Monique Burgess did not get the response from the Plaintiff she desired, she had Marcella Lobo Villodo increase the intensity of the experience. It is described in Exhibit A. It became the calling card of Monique Burgess. It simulated full penetration.

368

What began as an experiment and experience became a daily ritual for the Workgroup. Kayla Abbate, 30 confessed in Exhibit A and so did her father, Richard Abbate, 58, how they spent every night for almost—or over—four months sexually assaulting their immediate neighbor—the Plaintiff—as revenge for planting fourteen arbor vitae trees. It was a family activity with Kathleen M. Abbate, 58. They began the sexual assault every night when they sat down to dine. They did not stop until the Plaintiff went to sleep for the night.

369

Several and many persons associated with the Workgroup became involved in these types of aggravated sexual assaults. Exhibit A details a late afternoon in October 2021 when Roger Kass, esq. 62, Rebecca Bertrand, 37, Monique Burgess, 56, and Thomas Burgess, 58 for Kamala Harris simultaneously woke the

Plaintiff from a nap with both a physical assault and an aggravated sexual assault. About three or four hours later, at the insistence of the Plaintiff, <u>Kamala Harris</u> undid the manifestations of the events.

370

Individuals that committed Aggravated Sexual Assault/ Aggravated Sexual Abuse under 18 U.S. Code §113 & §114, Assaults are identified in Exhibit A chronologically as the events happened. After a few months, the <u>Workgroup</u> spoke and acted as one voice, making any one person or small group of persons impossible to identify. The members and their associates insisted they all acted uniformly together. In some instances, they no longer had to intend anything. If they just looked in a particular direction or at an object, it set the course of aggravated sexual assault in motion, making it almost a uniformly ritualized routine. Just as <u>Kayla Abbate</u> said, "All I had to do was look at the time on a clock, and it was set in motion."

371

All Defendants are liable under 18 U.S.C. §241, Conspiracy against Civil Rights. The Defendants had an implicit understanding based on their formal and informal meetings and group alliances, where applicable.

372

This case integrates the definition of Federal Hate Crime offenses committed on the basis of gender, age and marital status: Female, 62, living alone. See also—42 U.S.C. §13981—crimes motivated by gender, as discriminatory, violate the victim civil rights under federal law. With U.S.C. Crimes and Criminal Procedures §241, Conspiracy Against Rights and §245, Violent Interference with Federal Protected Rights there are protections.

373

18 USC Crimes and Criminal Procedures §241, Conspiracy Against Rights makes it "unlawful for two or more persons to conspire to injure, threaten, or intimidate a person…in the free exercise or enjoyment of any right or privilege secured to the individual by the US Constitution or the laws of the US."

374

All Defendants are in violation of 18 USC §241, as either primary perpetrators or as collusion parties. A ban wagon effect ensued from the start of the stolen book with every group of Defendants. Every level of activity and technology levied against the Plaintiff by the Defendants was an act to slander, harass, abuse, intimidate, coerce, threaten, physically harm, and sexually assault the Plaintiff 24 hours a day, 7 days a week for a minimum of over 750 days and ongoing to date.

375

18 USC Crimes and Criminal Procedures §245, "makes it a crime to use or threaten to use force to willfully interfere with a person's participation in a federally protected activity (such as employment, travel, public accommodations) because of religion, et al."

376

The Plaintiff applied for two professional positions at the <u>van Beuren Charitable Trust</u>, one on January 8, 2019 and one on February 3, 2020. The Plaintiff applied for two positions at the <u>Newport Art Museum,</u> one on November 19, 2020, and previously on January 13, 2017—a position that was never filled, and three positions at Newport Hospital, one April 25, 2016, November 12, 2019, November 26, 2019. The Plaintiff has a strong resume for portfolio management, major gift fund development, and general fund development positions. The Plaintiff received only one telephone interview— from Newport Hospital, for which a board of trustee told The Plaintiff, "No matter what your credentials, I would never have allowed them to hire you."

377

The Plaintiff's book was originally submitted to literary Agents, June 21, 2019. Many persons at the <u>Redwood Library Book Committee</u> and the <u>Newport Art Museum</u> knew the Plaintiff had written a book of fiction, but had not yet seen it. The Plaintiff had no knowledge of said Book Committee, a Secret Society of persons—current and former trustees, and executive staff—who gain access to stolen manuscripts through literary agency, edit them, and sell them overseas in reproduction markets such as Hong Kong, Dubai, Singapore, and other locations, or publish/bind them for inclusions in private or public libraries, for sale at flea markets and urban city corner kiosks.

378
<u>Hope van Beuren</u>, the matriarch of the <u>van Beuren Charitable Trust</u> , a direct heir to the Campbell Soup fortune, is a key figure in the ongoing activities of the <u>Redwood Library Book Committee,</u> a cornerstone of <u>Kamala's Table</u>, and a top major donor of <u>Newport Hospital,</u> having only recently donated over $10 million to renovate and rename the emergency department.  <u>Elizabeth Lynn</u>, Director of the <u>van Beuren Charitable Trust</u> actively manages the <u>van Beuren Charitable Trust</u> grants programs, over $100 million to date. The three children of <u>Hope van Beuren</u> and their spouses are the board of trustees for the <u>van Beuren Charitable Trust.</u> They review all resumes for <u>van Beuren Charitable Trust</u> positions. It was not possible to gain employment with <u>van Beuren Charitable Trust</u> because they had knowledge and or illicit possession of the applicant's, the author's, stolen book.

379
The same was true at <u>Newport Hospital</u>, and The <u>Newport Art Museum</u>, for which the Plaintiff had served ten consecutive years as a board of trustee, all as either an officer or as chair of governance and nominating. The Plaintiff could not understand the discrimination levied against her for the position applied for at the Newport Art Museum in November 2020. It became known four months later, <u>Norah Diedrich</u>, the Executive Director was a member of <u>Tom Hockaday's</u> House, Secret Society room. Not only did <u>Nora Diedrich</u> listen to <u>Kristin MacMannis</u>, also a former trustee, give a detailed summary of the Plaintiff's financial records and ongoing accounting thereof, but <u>Nora Diedrich</u> listened to <u>Jessica Hagen</u>, a former good friend of the Plaintiff's say the Plaintiff, "had questionable mental wellness issues." This was not the case. It was a remnant of the malpractice scenario of September 2011 levied by the Plaintiff's ex-husband, <u>Andrew Parsons, M.D.</u>

380
<u>Andrew Parsons, M.D.</u>, too, was at <u>Tom Hockaday's</u> House nightly reading his copy of the Plaintiff's illicitly begotten book. It was said <u>Nora Diedrich</u> desired to date <u>Andrew Parsons, M.D.</u> and was often masturbating with him. The Plaintiff's real estate agent, <u>Dina Karousos</u>—a friend of <u>Bethany DiNapoli's</u>—was also there, listening to everything and everyone. The Plaintiff had the home residence on the public market from June 2019 – December 31, 2020. It was said that sale was discussed and closely monitored at <u>Tom Hockaday's</u> House, especially with <u>Kristin MacManus</u> calculating and openly discussing a cash burn rate of the Plaintiff.

381
The group at <u>Tom Hockaday's</u> House was the impetus to "shake awake" the Plaintiff on February 4, 2021 so that they could pummel her daily. They would tag the Plaintiff, bring the Plaintiff into their fold, demand three truths of her every day and then "beat her over the head with a board and brick until she was beaten into the ground." This they intended every day for the rest of her life.

382
Firstly, the ex-husband, <u>Andrew Parsons, M.D.</u>— and then the Defendants—worked to get the Plaintiff to admit to an extramarital affair with <u>Donald Jagoe</u>, then secondly to the fact she plagiarized her work of fiction, and thirdly, that she had an abortion—which if it were true is violation of HIPPA laws. This activity alone was a basis of a Hate Crime; however, the real Hate Crime actions were multifactorial:

383

The constant taunting of the message "[The Plaintiff] is a twin soul seer with kundalini." No one really knew what all of this meant. Jean Gorham, Sandra Craig, Grenville Craig, Donald Jagoe, Patricia Fernandez, Sandra Oursuloff, and Michael Holt Massey III assumed to know. No one person willfully shares this information or what it means. Throughout history, Secret Societies such as the Knights Templar made such persons a target of attack.

384

At same time, Kamala's Table especially the van Beuren and Hamilton families (first cousins) routinely said, "Your book is not our cup of tea," "You are not one of us, you don't belong here in Newport.

385

At the same time moving from April 2021 to ongoing, the taunting cry was, "We don't love you, we don't like you, get the hell the hell out of her (Newport)." The Plaintiff would have moved to Connecticut between June 2109-Dece 2020, if she had sold her house, which was on the real estate market through Defendant Dina Karousos.

386

Jacalyn Egan, the first spokesperson for the Redwood Library Book Committee in April 2021, with Peter Wilcox, Elena Wilcox, and Christina McIntyre treated the plaintiff with distain and disrespect saying she was a lying, cheating, whore. That messaging never stopped. It has been picked up by the Kamala Harris Workgroup, and is ongoing.

387

Harry Gural arrived May 1, 2021. He made it known to everyone he had a previous sexual relationship with the Plaintiff in 1980. He and the Plaintiff had a mutually consenting conversation for five hours in the public commons of the open Secret Society space. Shortly thereafter, Harry Gural learned he had "heat" with the Plaintiff, making he and she a natural intimate couple of ascended energy. The Plaintiff had no knowledge of this phenomenon. Immediately, Tara Plochocki, esq. worked to assure Kamala Harris and her people that this discovery would not interfere with, nor undo any and all activities to incapitate the Plaintiff and her book. Tara Plochocki, esq, a 42-year old partner of a Washington, D.C. law firm, implemented a band wagon hate offence to secure Harry Gural, 64—a former US Senate Senior Legislative Analyst—as a key player in their game of incapitation of the Plaintiff.

388

Tara Plochocki, esq, mirrored, and then scaled activities from Kamala's Table. This created a global culture of discrimination, non-inclusion, isolation, and hate. Tara Plochocki, esq. specifically used the Plaintiff's Social Security number—which she would have retrieved through Secretary Gina Raimondo, Earl A. "Rusty" Powell III, and/or Grenville V. Craig—as a form of currency to play a nightly game. Firstly, her game was for people to meet Harry Gural, a man the Plaintiff knew in college, but an unknown in Newport—but, only those who knew the Plaintiff. No one knew that. Secondly, those meeting Harry Gural must provide a unique insult about the Plaintiff that Tara Plochocki, esq. would first personally vet for its intensity. She became a gatekeeper. He did not know the currency.

389

Individuals were all on a scavenger and treasure hunt for a continuous stream of insults from anyone the Plaintiff had ever known, or from those listening and gossiping. They all memorized and shared the Plaintiff's social security number. It appeared those orchestrating the game wanted the Plaintiff's identity stolen.

390

As time continued, any previous group of people known to the Plaintiff copied the behavior. It set the stage for physical assault and sexual assaults using sorcery and black magic technologies known through Secret. Societies. Jean Gorham repeatedly said the Plaintiff would be raped every day of her life moving forward. What began in August 2019, accelerated in September/October 2021 and is ongoing.

391

All Defendants as direct principles, group members, group associates, or other recruits, regardless of group affiliation, associated and acted together both within respective groups, and in totality together, as one unified group of Defendants. Each group spoke, and acted together to the point of speaking in one unified voice for one unified outcome. Only those who left the field—those who were pulled out by another, stopped their involvement, or sought other remedies. All the named Defendants remained. Most sought further advancement in the circumstances of the endeavor. No Defendant can prove innocence to any civil or criminal offense. Silence became a voice of consent. Federal criminal code 18 U.S.C.§2, Aiding and Abetting holds for all defendants.

392

"Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years or both..."

393

All Defendants are liable under 18 U.S.C. §4, Misprision of a Felon.

394

Under federal criminal code, 18 U.S.C. §3, Accessory after the Fact, "A person who knowingly aids someone who has committed a crime:"
Everyone at Kamala's Table knew the book was stolen.
Everyone in the case associated with Tom Hockaday's House knew the book was stolen.
Everyone at the Redwood Library Book Committee knew the book was stolen.
Everyone associated with Newport Hospital in the case knew the book was stolen.
Everyone at van Beuren Charitable Trust knew the book was stolen.
Everyone emailed by Andrew Parsons, M.D. at Anesthesia Associates of Mass. knew the book was stolen.
The entire shaman network, secret society networks, and energy realm networks on February 4, 2021 knew the book was stolen.
Jonathon Karp, CEO, Simon & Schuster knew the book was stolen.
Nancy Graham, SVP Scribner, knew the book was stolen.
Beatrice of York and Catherine Middleton of the British Royal family knew the book was stolen.

395

The stolen book set a stage for the commitment of other crimes and offenses against the Plaintiff. All Defendants held their silence as consent, acceptance, approval, and agreement.

396
No one was allowed to speak to the Plaintiff to provide information, counsel, aid or advice.

397
All Defendants are liable under 18 U.S.C §3, Accessory After the Fact.


Relief Sought

Firstly, the Plaintiff seeks to prosecute the Defendants to the fullest extent of the law for crimes and civil offenses.

Secondly, the Plaintiff asks the court to consider enforcing the contract with Scribner, Simon and Schuster for the publication of the Plaintiff's novel at the pre-contracted compensation. The Plaintiff will accommodate publication under any of the three Simon & Schuster imprints: Atria Books, Simon & Schuster flagship, and Scribner. With over 2,000 titles published annually across 35 imprints, the company can accommodate an additional book, especially one known world-wide in all languages. This would also reverse the Redwood Library's vetting process to exclude authors from Newport, Rhode Island writing about Newport, Rhode Island. In 2023, Simon & Schuster published a work of fiction by an unknown female writer of no credentials living in on the adjacent resort island of Jamestown, Newport County, Rhode Island.

Thirdly, the Plaintiff seeks every and all forms of remuneration for damages, especially pain and suffering incurred by her as a direct result of the extreme actions taken against her in this case. The Plaintiff has a settlement amount pre-calculated for each Defendant. Settlements are based on a multiplier for what was done specifically by individual, time and outcome durations of the individual's actions, intensity of individual action, pain and suffering from the actions, any and all losses incurred from the actions, financial capacity, and the crimes and civil charges involved. The Plaintiff is acquainted with almost each and every Defendant, except the state actors.

I, the Plaintiff, certify to the Court, the statements made are true to the knowledge and experience of the Plaintiff, signed this day, April 3, 2023.


*Pamela Chapman*

Pamela Chapman
121 King Charles Drive
Portsmouth, Rhode Island 02871
401-662-9516